2021 UT App 91

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.B.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

K.T.,
Appellant,
*v.*
S.T. AND T.T.,
Appellees.

Opinion
No. 20200342-CA
Filed August 26, 2021

Third District Juvenile Court, Salt Lake Department
The Honorable Julie V. Lund
No. 1174795

Steve S. Christensen and Clinton Brimhall, Attorneys
for Appellant

Sheleigh A. Harding, Attorney for Appellee

Martha Pierce, Guardian ad Litem

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1     Each summer for nearly a decade, Annabelle[1]—with the
permission of her mother, K.T. (Mother)—went to visit and stay
with welcoming relatives. Eventually, and on agreement,
summer turned into a whole year. When the hosting family then

---

1. A pseudonym.

sought custody, the juvenile court characterized the situation as "neglect" and granted the request. Mother now appeals, and we reverse.

BACKGROUND

¶2　Like many parents returning to work, Mother utilized the assistance of family and friends to help care for Annabelle after giving birth to her in 2008. But as the years went by, Mother's use of family and friends to help with childcare went beyond mere "babysitting." As Annabelle grew older, Mother established a pattern of leaving Annabelle with a welcoming relative every summer; often, Annabelle spent the summer at the home of Mother's aunt, S.T. (Aunt), and uncle, T.T. (Uncle). Finally, in 2018, Mother—who at the time was struggling with parenting Annabelle—agreed to allow Annabelle to spend not just the summer but the entire 2018–2019 school year with Aunt and Uncle in Utah.

¶3　In the years leading up to Annabelle's yearlong residence with Aunt and Uncle, Mother and Annabelle had moved to New Mexico. There, Annabelle demonstrated behavioral problems including throwing chairs, hitting, screaming, kicking, "'thrashing out,' and expressing rage and hatred toward Mother." Annabelle even "claimed to want to die," a sentiment that, purportedly based on the advice of Annabelle's counselor, Mother thought "was not abnormal" for a person of Annabelle's age. Eventually, this crisis led Mother to reach out to Aunt and tell her, "I'm depressed, my daughter is depressed. All we do is cry some days." Not long after, Mother asked Aunt to meet with her and take Annabelle because "[s]he's out of control, grumpy, [and] thrashing out." Aunt and Uncle agreed. So, Annabelle's annual summer migration to Utah started early that year when Mother left Annabelle with Aunt and Uncle in May 2018 and moved to North Carolina with her boyfriend.

¶4 About Annabelle's year with Aunt and Uncle, the juvenile court heard conflicting testimony. On the one hand, the juvenile court heard that Mother monitored Annabelle's progress in school, that Mother purchased clothes for Annabelle even though Aunt and Uncle "never asked [her] for financial support," that Mother engaged in "several" phone calls with Annabelle over that time period, and that Mother gave Aunt and Uncle specific requests, including that they "put [Annabelle] into counseling." On the other hand, Mother admitted that she did not visit Annabelle for over six months from October 2018 to May 2019, and the court heard testimony that Mother declined to participate when offered "extra opportunities . . . to contact [Annabelle] on the phone more frequently, extra opportunities to participate with [Annabelle] in activities, and the opportunity to attend an eye doctor appointment." Aunt and Uncle also testified that Mother provided no financial support for Annabelle's needs and refused to assist Aunt and Uncle with costs associated with medical co-pays, fixing Annabelle's eyeglasses, or purchasing school clothes and supplies. Aunt and Uncle claimed that Mother told them, "She's your responsibility. I don't need to take care of anything, it's your responsibility." Aunt and Uncle further maintained that, at their home, Annabelle transformed from "reserved," "quiet," and fearful, to "thriving and happy."

¶5 A week before that school year's end, in May 2019, Mother unexpectedly checked Annabelle out of school, planning to drive her back to North Carolina. Aunt and Uncle "retrieved [Annabelle] by way of an ex parte protective order" and filed a petition requesting custody, which the juvenile court granted temporarily. In addition to the testimony about the time at Aunt and Uncle's home, the court heard testimony that Mother's "parenting style lack[ed] affection," "nurturing," and "comforting behavior"—for example there was "no hugging"—and that Mother often peppered Annabelle with various insults. Aunt and Uncle also described that during one of Annabelle's

unsupervised visits with Mother, they received an accidental dial from Annabelle and, after answering the call, overheard Mother "yelling at [Annabelle] that she 'needed to go . . . tell [Aunt and Uncle] that she needed to come home right now'" and to tell Aunt and Uncle to call Annabelle's guardian ad litem to relay the same message. If she did not, Mother said, "a lot of people [would] get hurt." Aunt and Uncle terminated this visit, but in their view more generally, Annabelle "was very depressed and sad after visits with" Mother, and only "[a]fter lots of support and kindness from [Aunt and Uncle]" would Annabelle "return to her normal, happy self." And Mother did testify "that if custody were returned to her, she would cut off all contact between [Annabelle] and [Aunt and Uncle]."

¶6    Ultimately, the juvenile court determined that although "[M]other loves [Annabelle]," "love alone is not enough for a child," and that Mother's conduct "demonstrates a complete disregard for the best interests of [Annabelle] and further demonstrates a pattern of [Mother] consistently placing her own best interests before those of [Annabelle]." Further, the court determined that Mother had "been unwilling or unable to provide [necessary] stability, and ha[d] therefore asked other family members to care for [Annabelle] for protracted lengths of time." The court made findings and concluded that Mother "neglected" Annabelle and therefore granted Aunt and Uncle permanent custody and guardianship.

¶7    Specifically, the court entered conclusions of law that:

> [Annabelle] has been neglected by [Mother] in the form of emotional maltreatment, which has caused [Annabelle] to be insecure, afraid and emotionally disturbed.
>
> [Annabelle] has been neglected by [Mother] by being placed with relatives for extended and

regular periods of time without support from [Mother].

. . . .

[Mother] has neglected [Annabelle] in not assisting in paying for her support or providing items for [Annabelle's] care. . . .

It is in [Annabelle's] best interests to be placed in the permanent custody and guardianship of [Aunt and Uncle].

¶8    Mother appeals the juvenile court's neglect determination.

ISSUE AND STANDARD OF REVIEW

¶9    Mother raises one issue we address here: whether the juvenile court improperly determined that Mother's conduct amounted to "neglect." "We apply differing standards of review to findings of fact, conclusions of law, and determinations of mixed questions of law and fact." *In re E.R.*, 2021 UT 36, ¶ 14. Here, Mother does not dispute the juvenile court's relevant findings of fact but instead contends that the juvenile court improperly applied the governing law. "This is a mixed determination of law and fact—in which the abstract law is applied to a given set of facts." *Id.* ¶ 17. And,

> the standard of review for mixed questions depends on the nature of the issue. Law-like mixed questions are reviewed de novo, while fact-like mixed questions are reviewed deferentially. To determine whether a mixed question should be deemed law-like or fact-like, we evaluate the marginal costs and benefits of conducting either a

searching de novo review or a deferential review of a lower tribunal's resolution of the mixed question.

De novo review of mixed questions is appropriate where a fresh appellate reconsideration of the issues presents little downside and significant upside. Issues that are law-like are matters that lend themselves to consistent resolution by uniform precedent. Appellate courts are in a preferred position on such issues. They can establish a uniform body of precedent establishing consistent rules that litigants and lower courts can rely on. And a need to establish such rules cuts against a standard of deference to lower courts.

*Id.* ¶¶ 18–19 (cleaned up). We distinguish law-like questions from fact-like questions based on

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on facts observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts.

*Id.* ¶ 21 (cleaned up).

¶10   As to the first two factors, where Mother does not dispute the relevant facts as found by the juvenile court, the facts before us are set and clear, and, having been entered by the juvenile court, are not dependent on disputed subjective factors observed by the juvenile court. As to the third factor, where the

application of a statute to the facts lies in the vein of statutory interpretation—which is reviewed for correctness, *see State v. Soules*, 2012 UT App 238, ¶ 2, 286 P.3d 25—sound policy dictates that application of statute be reviewed de novo, giving no deference to the juvenile court. We view the question presented here as law-like because it concerns whether the facts as constituted meet the legal standard of the statute. De novo review here presents little downside and allows this court to establish precedent on which future litigants and lower courts can rely. Accordingly, we review the issue presented here giving no deference to the juvenile court.

## ANALYSIS

¶11    In contending that the juvenile court misapplied the statutory definition of "neglect," Mother argues that "the juvenile court's reasons for determining that [Annabelle] is a neglected child do not fall under the neglect statute or relate to that statute" or, at most, "bear only a passing relation." Upon reviewing the juvenile court's conclusions of law alongside the relevant statute, we conclude that the juvenile court failed to properly link its findings of fact and conclusions of law to the statute defining "neglect" in these situations.

¶12    Initially, while we are sensitive to the challenging circumstances Annabelle has experienced in this case, we nevertheless must acknowledge the presumption in the law that generally parents have a right to the custody of their children. *See In re C.Z.*, 2021 UT App 28, ¶ 16, 484 P.3d 431. Speaking about a related area of law, termination of parental rights, our supreme court has said that "[n]o parent could be deprived of his or her parental rights without a prior showing of unfitness, abandonment, or substantial neglect," and that "[s]o long as a parent's conduct remain[s] within those broad bounds, the state [is] not empowered to terminate the parent-child relationship."

*See In re J.P.*, 648 P.2d 1364, 1367 (Utah 1982). Our supreme court has further stated,

> It is rooted in the common experience of [humankind], which teaches that parent and child normally share a strong attachment or bond for each other, that a natural parent will normally sacrifice personal interest and welfare for the child's benefit, and that a natural parent is normally more sympathetic and understanding and better able to win the confidence and love of the child than anyone else.
>
> The parental presumption is not conclusive, but it cannot be rebutted merely by demonstrating that the opposing party possesses superior qualifications, has established a deeper bond with the child, or is able to provide more desirable circumstances. If the presumption could be rebutted merely by evidence that a nonparent would be a superior custodian, the parent's natural right to custody could be rendered illusory and with it the child's natural right to be reared, where possible, by his or her natural parent.

*Hutchison v. Hutchison*, 649 P.2d 38, 40–41 (Utah 1982) (cleaned up). We recognize that this is not a termination of parental rights case, and we do not apply the presumption here, but this is all to emphasize the importance of the natural parent-child relationship and clarify that before a juvenile court removes a child from a natural parent based on the presence of "neglect," that court must find facts that meet the statutory definition of neglect, which definition the legislature has deemed substantial enough to warrant the drastic consequence of removing a child from that child's natural parent.

¶13    Utah law provides six bases on which a juvenile court may determine that a situation amounts to "neglect." Utah Code Ann. § 78A-6-105(40)(a) (LexisNexis Supp. 2020).[2] Specifically,

> "Neglect" means action or inaction causing:
>
> (i) abandonment of a child . . . ;
>
> (ii) lack of proper parental care of a child by reason of the fault or habits of the parent, guardian, or custodian;
>
> (iii) failure or refusal of a parent, guardian, or custodian to provide proper or necessary subsistence or medical care, or any other care necessary for the child's health, safety, morals, or well-being;
>
> (iv) a child to be at risk of being neglected or abused because another child in the same home is neglected or abused;
>
> (v) abandonment of a child through an unregulated custody transfer; or
>
> (vi) educational neglect.

*Id.* However, as far as we can tell, the court did not base its ruling on any of these statutory grounds. Instead, the court found that Annabelle had "been neglected by [Mother] in the form of emotional maltreatment," that Anabelle had "been neglected by [Mother] by being placed with relatives for

---

2. We note that since the relevant time, the statute's contents have been renumbered but have not substantively changed. For convenience, we cite the current code.

extended periods of time," and that "Mother ha[d] neglected [Annabelle] in not assisting in paying for her support or providing items for [Annabelle's] care."

¶14 We do not see the required relation between these explanations—as expressed in the court's conclusions of law—and the statutory text. As to the conclusion that Annabelle had "been neglected by [Mother] in the form of emotional maltreatment," Aunt and Uncle concede that "emotional maltreatment is . . . not neglect"; and, indeed, this concession aligns with our own caselaw as provided in *K.Y. v. Division of Child & Family Services*, 2010 UT App 335, 244 P.3d 399, which clarified that "the statutory definition of neglect cannot be construed to include emotional maltreatment."[3] *See id.* ¶ 20.

---

3. Aunt and Uncle also contend that the juvenile court mistakenly referred to "emotional maltreatment" when it actually meant to write "emotional abuse" and ask us to affirm the juvenile court's ruling on that alternative ground. However, the language in the court's ruling does, in fact, say "emotional maltreatment," and we view "abuse" as such a significant term of art under the statute that a juvenile court's failure to use this word in a particular instance cannot reasonably be viewed as a mere typographical error. *See generally* Utah Code Ann. § 78A-6-105(1) (LexisNexis Supp. 2020) (defining "abuse"). Certainly, the juvenile court made no substantive findings regarding emotional abuse, perhaps because Aunt and Uncle testified that Annabelle was "thriving," a condition inconsistent with the presence of emotional abuse. *See id.* § 78A-6-105(1)(a)(i)(A)–(B), (29)(b) (defining "abuse" as including "harm," and defining "harm," in relevant part, as "emotional damage that results in a serious impairment in the child's growth, development, behavior, or psychological functioning"). We therefore decline Aunt and Uncle's invitation to affirm on the alternative ground of emotional abuse.

Similarly, the court's statements that Annabelle has "been neglected by [Mother] by being placed with relatives for extended periods of time" and that "Mother has neglected [Annabelle] in not assisting in paying for her support or providing items for [Annabelle's] care" do not clearly fall within the statute's language. *See infra* ¶¶ 15–21.

¶15 After reviewing the actual statutory grounds found in Utah Code section 78A-6-105(40)(a), we come no closer to seeing a connection between the court's findings and conclusions and the statutory language. Of the statute's six grounds for neglect, none apply to this case under the facts as found by the juvenile court.

¶16 First, Annabelle cannot have been subject to "educational neglect," Utah Code Ann. § 78A-6-105(40)(a)(vi), because "educational neglect" occurs only when a parent "fails to make a good faith effort to ensure that the child receives an appropriate education" after "receiving a notice of [a] compulsory education violation," *id.* § 78A-6-105(20). The juvenile court made no findings in this regard.

¶17 Second, Annabelle cannot have been abandoned through an "unregulated custody transfer," *id.* § 78A-6-105(40)(a)(v), because an "[u]nregulated custody transfer" occurs only when the child is left with someone other than statutorily specified family members or an adult friend of the family—and no party challenges whether Aunt and Uncle fit in this category, *id.* § 78A-6-105(64)(a).

¶18 Third, Annabelle cannot have been "at risk of being neglected . . . because another child in the same home is neglected," as no other child is identified in the juvenile court's findings of fact. *Id.* § 78A-6-105(40)(a)(iv).

¶19 Fourth, although appearing closer to the mark, Annabelle cannot have been subject to the "failure or refusal of a parent,

guardian, or custodian to provide proper or necessary subsistence or medical care, or any other care necessary for the child's health, safety, morals, or well-being." *Id.* § 78A-6-105(40)(a)(iii). To be sure, Mother did refuse to pay Aunt and Uncle for various aspects of Annabelle's care. However, in interpreting a statute, "we look first to the statute's plain language and presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." *In re J.M.S.*, 2011 UT 75, ¶ 13, 280 P.3d 410 (cleaned up). And here, the statute's plain language relates only to a parent's refusal to provide care—it says nothing about a parent's refusal to reimburse another caretaker for providing the care. If a non-parent party, retaining custody of a child, contends that a parent should pay for that child's care, the non-parent party's remedy is to return the child to the parent's custody, where the parent would bear the monetary burden of providing for the child's necessary care. On the facts before us, Mother never refused to provide care but refused only to reimburse Aunt and Uncle for providing that care. Thus, because the statute does not discuss money at all, the fact that Mother refused to repay Aunt and Uncle is neither here nor there for purposes of applying the statute to this situation and does not support a finding of neglect.

¶20    Fifth, again, although apparently more applicable than other alternatives, Annabelle cannot have been subject to a "lack of proper parental care . . . by reason of the fault or habits of the parent, guardian, or custodian." Utah Code Ann. § 78A-6-105(40)(a)(ii). While it would be inaccurate and insensitive to suggest that the interactions between Mother and Annabelle approached ideal, the record before us suggests that Annabelle received proper parental care, even if not always at Mother's hand. And while Aunt and Uncle identify certain facts that they allege suggest a lack of proper parental care, the juvenile court did not rely on these facts in identifying the situation as neglect,

and we are skeptical that such facts could have amounted to neglect in any event.

¶21    Sixth, under the facts as applied by the juvenile court, we cannot determine whether Annabelle faced "abandonment." *Id.* § 78A-6-105(40)(a)(i). The juvenile court did not analyze whether a parent who leaves a child temporarily with relatives could be considered to have abandoned the child; indeed, the juvenile court made no findings that it connected to abandonment, and its conclusions of law contain no language that suggests to us that the neglect determination rested on a finding of abandonment under section 78A-6-105(40)(a)(i). In short, the findings of fact and conclusions of law set forth by the juvenile court do not bear a connection to the governing statute sufficient to remove Annabelle from the custody of her natural parent on the basis of "neglect."

## CONCLUSION

¶22    In declaring that Mother neglected Annabelle, the juvenile court made insufficient connection between its findings of fact and conclusions of law and the actual statutory grounds governing findings of "neglect." The facts as found by the juvenile court do not meet the statutory definition of "neglect." Therefore, we reverse the court's order of permanent custody and guardianship issued in favor of Aunt and Uncle.

―――――――――