**2023 UT App 132**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF G.H. AND R.H.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

L.G.,
Appellant,
*v.*
R.G. AND R.G.,
Appellees.

Opinion
No. 20220920-CA
Filed November 2, 2023

Seventh District Juvenile Court, Price Department
The Honorable Craig Bunnell
No. 1210014

Steve S. Christensen and Clinton Brimhall,
Attorneys for Appellant

Colleen K. Coebergh, Attorney for Appellees

Martha Pierce, Guardian ad Litem

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     The maternal grandparents of two children filed a petition
for guardianship, alleging neglect by both parents and abuse at
the hands of the children's father. The guardianship was
contested, and a trial was held. After trial, the juvenile court
granted the petition, finding facts consistent with the allegations
of the petition and determining that the guardianship was in the
best interest of the children. Further, the juvenile court
determined that the mother's parent-time, if any, would take
place at the unfettered discretion of the grandparents. The mother

appeals, claiming the juvenile court erred in determining neglect, erred in failing to order parent-time, and wrongfully denied a motion to change venue as to one of the children. For the most part, we affirm. However, the juvenile court's findings regarding the mother's parent-time rights are inadequate, and we therefore remand this matter for the entry of further findings and conclusions as necessary.

## BACKGROUND

¶2 AG (Mother) and JH (Father) are the natural parents of GH and RH (the Children).[1] In April 2022, Mother's parents, RG and RG (Grandparents), petitioned for guardianship and custody of the Children, alleging that such a placement was in the best interest of the Children due to Father's abuse and both parents' neglect. A few days later, Grandparents filed an ex parte motion for temporary custody of the Children, and the juvenile court granted the request.

¶3 At a pre-trial hearing, Mother asked for an expedited evidentiary hearing regarding temporary custody. The court declined that request and instead held a combined adjudication and disposition hearing over two trial days in July and August 2022.

¶4 After that hearing, the court issued an order setting forth findings of fact and conclusions of law regarding adjudication and disposition. Because Mother does not dispute the findings of fact, we recite the facts directly from the juvenile court's findings.[2]

---

1. RH has a twin, who has lived with the maternal great-grandmother since April 2021 and is not involved in this case.

2. Mother disputes the findings of fact only with regard to venue. But as our disposition makes clear, these factual disputes are immaterial.

¶5      The court took judicial notice of a 2019 order in which the same court terminated Mother's parental rights to an older child, who was adopted by Grandparents shortly thereafter. Mother stated she had "no idea" why her maternal rights for the older child were terminated, but the record shows that it was primarily due to Mother's neglect.

¶6      Mother moved in with Grandparents in Price, Utah, in July 2019 and lived with them through the first part of January 2022. From June through September 2021, Mother worked evenings (5:00 p.m. to 9:00 p.m.). She had surgery for "a minor thing" in September 2021. Mother was unemployed until she obtained full-time employment in December 2021. At this job, she worked ten-hour shifts (10:00 a.m. to 8:00 p.m.) four days per week.

¶7      While living with Grandparents, Mother "relied on [Grandparents] almost exclusively and for nearly everything for [the Children] . . . . [Grandparents] were the primary caretakers for [the Children's] day-to-day physical, developmental, medical, and financial needs."

¶8      With regard to the Children's physical needs, Mother "did very little to make arrangements for [the Children], provide basic care, or assist with household duties," even when asked to do so. She did not provide "day-to-day food or meals" for the Children, nor did she help with potty training GH.

¶9      Regarding developmental needs, Grandparents provided for "the vast majority of [the Children's] indoor and outdoor activities, toys, and one-on-one parent-role interactions." Mother "did very little to actually parent [the Children] or care for their needs," and she did not assist with "mothering" the Children. When asked to care for the Children, other than watching the Children for about five hours some weekdays when Grandparents were both working, "Mother would often say she was too tired, too busy, be on her phone or smoking, or on her bed resting or lounging."

¶10   Mother's sister (Sister) would often visit Grandparents' house (about two times each week when Grandparents were not there), and she observed Mother being "verbally abusive or terse with [the Children]," leaving them "unattended or unsupervised, not changing diapers as needed, or not caring for them." The court also found, based on Sister's testimony, that Mother would often "come to [Sister's] house (at times unannounced) without child-care supplies or clothes," asking for help with the Children because Mother was "tired, needed a break, going out with friends, or going to work (although, at times, she did not go to work, but went back to [Grandparents'] house to sleep or smoke)."

¶11   Financially, Mother sometimes shared her government food assistance card but relied on Grandparents for most of the Children's financial needs. She also relied on Grandparents to provide birthday or Christmas gifts for the Children. She did, however, reimburse Grandparents a few hundred dollars and paid for some daycare.

¶12   Regarding medical needs, Mother took the Children for immunizations, but she did not take them to other types of medical appointments or help Grandparents when the Children were sick with ear infections, colds, or other maladies.

¶13   In January 2022, Mother moved in with another relative (Step-Grandmother) in Highland, Utah, which was twenty minutes from her newly acquired job. Grandparents continued as GH's primary caretakers in Price, but RH moved to Step-Grandmother's house with Mother.

¶14   During this time-period, RH received daily and weekly care in four different cities separated by nearly a hundred miles and by four different caregivers besides Mother, namely Step-Grandmother, Great-Grandmother, Father's mother, and Grandparents. Essentially, Grandparents and Great-Grandmother would relieve Step-Grandmother when she was not available to watch RH. Sometimes Mother would be the one to

take RH to Great-Grandmother's house. Step-Grandmother, Grandparents, the maternal great-grandmother (Great-Grandmother), or Mother transported RH, and sometimes GH, from house to house on weekends. Mother's mother handled most of the Children's care coordination, "unless Mother needed to preplan to accommodate her own work schedule." RH did not stay in "one consistent place or house" during this time-period; RH was at a "different house almost every day of the week, and each week was different than the last."

¶15 Watching Mother with the Children "scared" Step-Grandmother, and she never saw Mother being "a mother" to the Children. Mother was "negative verbally" to the Children and "put her own wants and needs before RH's needs." Mother would get upset when Step-Grandmother wanted to go out, making it necessary for Mother to watch RH.

¶16 Mother provided very little assistance to Step-Grandmother with household duties, except for washing her and RH's clothes, and "Mother's bedroom was always cluttered (with RH's clothes on the floor) and never cleaned." Mother put RH to bed half the time, but Step-Grandmother noted that the time was never consistent, as Mother sometimes would come home as late as 10:30 p.m. On some Friday nights, Mother did not come home at all until later that weekend.

¶17 While living with Step-Grandmother, Mother changed RH's diaper only about once per day; smoked cigarettes "all the time"; was "always on her phone"; did not give baby food or regular feeding; and did not read to, play with, sing to, or bathe RH.

¶18 In mid-March 2022, Mother moved into a rental house in Murray, Utah, with RH. Although Step-Grandmother no longer provided RH daily care after the move, Mother still used Grandparents, Great-Grandmother, and Father's mother to care for RH. Mother's work schedule changed to eight hours per day, five days per week (12:00 p.m. to 8:00 p.m. or 2:00 p.m. to 10:00

p.m.). Grandparents primarily watched RH on weekends. GH continued to live with Grandparents.

¶19   On April 5, 2022, Mother picked up Father from prison, and he lived with Mother from then until at least July 2022, when Mother learned—on the first day of trial through Father's probation officer's testimony—that Father had used drugs just a week before. Before hearing this testimony, "Mother did not believe he would use drugs." Mother allowed Father to watch the Children unsupervised, and until trial, she had planned to continue living with him, despite knowing that Father was convicted of assaulting someone in prison two months prior to his release and despite complaining to Grandparents that Father was "controlling and threatening her, taking her phone and car, refusing to work, and taking advantage of her." Father's assault conviction "did not cause her any concern" about him being with her or the Children.[3] The court found that Mother's reintroduction of Father into the Children's lives "was an emphatic demonstration to the Court of Mother's poor judgment and her continued inability (since having her parental rights terminated to an older child in 2019 and since [the Children] were born) to put [the Children's] needs and welfare before her own."

¶20   Mother made efforts to obtain a full-time job and to perform well at her job to provide for her and the Children.[4] But the court concluded that Mother "did not progress over the last three years as was necessary and appropriate for her to meet the daily needs" of the Children. Instead, Grandparents, Step-

---

3. Although the court found that Father had "an extensive and violent criminal history, including convictions for interfering with arrests, assaults, disorderly conduct, and threats of violence," it did not make a specific finding regarding Mother's knowledge of his violent criminal history outside of the event in prison.

4. When asked about how Mother was performing at work, her supervisor testified, "She is incredibly reliable. She's one of my go-to staff . . . ."

Grandmother, Great-Grandmother, and others provided "the crucial day-to-day parenting and caretaking that are necessary for [the Children] to thrive developmentally and otherwise."

¶21　The court also found that the Children "thrived living together with [Grandparents] prior to Mother moving out of [Grandparents'] home in January 2022" and after being reunited in Grandparents' home in April 2022. The court noted that Grandparents "demonstrated their reliability and consistent efforts to provide for all of [the Children's] day-to-day physical, mental, emotional, developmental, medical, financial, and educational needs." The court emphasized that the Children should be living together.

¶22　Based on these factual findings, the court concluded there was clear and convincing evidence that Mother neglected the Children. The court also concluded, based on clear and convincing evidence, that the Children's best interests would be met by granting Grandparents permanent custody and guardianship. Additionally, the court ordered that Mother's and Father's parent-time with the Children "shall be at the discretion and under the control or management of [Grandparents]."

¶23　As relevant here, Mother moved the court to dismiss Grandparents' petition for improper venue or to transfer venue, which the court denied. Mother now appeals.


ISSUES AND STANDARDS OF REVIEW

¶24　Mother argues that the juvenile court erred when it determined that the Children were neglected. Mother clarifies that she is not disputing the court's findings of fact but the court's application of these findings to the law; therefore, "we accept these findings as true in our analysis on appeal." *d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 24, 147 P.3d 515. "We view the question presented here as law-like because it concerns whether the facts as constituted meet the legal standard of the statute. . . .

Accordingly, we review the issue presented here giving no deference to the juvenile court." *In re A.B.*, 2021 UT App 91, ¶ 10, 498 P.3d 894, *aff'd*, 2022 UT 39, 523 P.3d 168.

¶25 Mother also argues that the juvenile court erred in not awarding her parent-time and thus failing to give due consideration to her residual parental rights. "We generally will not disturb the district court's parent-time determination absent a showing that the court has abused its discretion. However, we review the district court's interpretation of a statute for correctness. Likewise, we review the legal adequacy of findings of fact for correctness as a question of law." *Lay v. Lay*, 2018 UT App 137, ¶ 4, 427 P.3d 1221 (cleaned up).

¶26 Finally, Mother argues that the juvenile court erred in denying her motion to dismiss or transfer based on venue. Venue "is a question committed to the district court's discretion, which we review for an abuse of discretion." *Davis County v. Purdue Pharma, LP*, 2020 UT 17, ¶ 7, 463 P.3d 619.

ANALYSIS

I. Neglect

¶27 "If, at the adjudication[5] hearing, the juvenile court finds, by clear and convincing evidence, that the allegations contained in the abuse, neglect, or dependency petition are true, the juvenile court shall conduct a dispositional hearing." Utah Code § 80-3-402(1). "The dispositional hearing may be held on the same date as the adjudication hearing . . . ." *Id.* § 80-3-402(3). At the dispositional hearing, the juvenile court then "may vest custody of an abused, neglected, or dependent minor in the division or any other appropriate person." *Id.* § 80-3-405(2)(a)(i). "If a minor has

---

5. Adjudication "means a finding by the court . . . that the facts alleged in the petition have been proved." Utah Code § 80-1-102(3)(a).

been placed with an individual or relative as a result of an adjudication . . . , the juvenile court may enter an order of permanent legal custody and guardianship with the individual or relative of the minor." *Id.* § 80-3-405(2)(d)(i). "Clear and convincing evidence is an intermediate standard of proof that implies something more than the usual requirement of a preponderance of the evidence; and something less than proof beyond a reasonable doubt. Put differently, this standard requires the existence of facts that make a conclusion very highly probable." *In re K.K.*, 2023 UT App 13, ¶ 22, 525 P.3d 519 (cleaned up), *cert. denied*, 531 P.3d 731 (Utah 2023).

¶28 Neglect is statutorily defined, and can be proved in any one of several ways. *See* Utah Code § 80-1-102(58)(a)(i)–(vi).[6] While the juvenile court found neglect under several subsections, to affirm we need conclude only that neglect was established under one of the bases. *See In re E.F.*, 2013 UT App 13, ¶ 3, 295 P.3d 1165 (per curiam) (upholding juvenile court's conclusion that mother neglected child under the sole basis of lack of proper parental care by reason of parent's faults or habits). Among other bases, the juvenile court found neglect under subsection (ii), which defines neglect as "action or inaction causing . . . lack of proper parental

---

6. Utah Code section 80-1-102(58)(a) defines "neglect" as follows:

> [An] action or inaction causing: (i) abandonment of a child . . . ; (ii) lack of proper parental care of a child by reason of the fault or habits of the parent, guardian, or custodian; (iii) failure or refusal of a parent, guardian, or custodian to provide proper or necessary subsistence or medical care, or any other care necessary for the child's health, safety, morals, or well-being; (iv) a child to be at risk of being neglected or abused because another child in the same home is neglected or abused; (v) abandonment of a child through an unregulated child custody transfer under Section 78B-24-203; or (vi) educational neglect.

care of a child by reason of the fault or habits of the parent, guardian, or custodian." Utah Code § 80-1-102(58)(a)(ii). We agree with the juvenile court that the evidence supported a finding that this basis for neglect had been proved.

¶29 First and foremost, the factual findings demonstrated that Mother did not attend to the Children's basic health and welfare needs, such as feeding and bathing them, changing their diapers regularly, and obtaining medical care for them when they were sick. Mother also did not show any interest in potty training GH.

¶30 Moreover, Mother did not behave in a manner consistent with parenting a child. For example, Mother did not demonstrate a desire to play with the Children, read or sing to them, or buy them birthday and Christmas presents. And Grandparents were the ones to provide the Children's indoor and outdoor activities and toys rather than Mother.

¶31 Similarly, the findings revealed that Mother lacked interest in being around the Children, and she would refuse to care for them when asked by the family members with whom she was living. Mother would complain that "she was too tired" or "too busy," or she would prefer to "be on her phone or smoking, or on her bed resting or lounging." Likewise, Mother would drop off the Children unannounced at Sister's house—"without child-care supplies or clothes"—because Mother was "tired, needed a break, [or was] going out with friends, or going to work," although, at times she went back to Grandparents' house "to sleep or smoke" instead. Mother also would get upset when Step-Grandmother wanted to go out some evenings, thus leaving Mother to care for the Children. In addition, "Mother did not do household duties when asked to do so."

¶32 Although the court did acknowledge Mother's commendable efforts with her current job, it still found that Mother "did not progress over the last three years as was necessary and appropriate for her to meet the daily needs of each of [the Children]."

¶33 Furthermore, the findings demonstrate that Mother was not troubled by Father being with her or the Children. Even though Mother knew that Father was convicted of assaulting someone while in prison and said that he was "controlling and threatening her, taking her phone and car, refusing to work, and taking advantage of her," Mother allowed Father to watch the Children unsupervised and, until learning of his continued drug use at trial, had planned to go on living with him. Additionally, despite Father's history with drug use, Mother "did not believe he would use drugs." Mother's reintroduction of Father into the Children's lives demonstrated to the court "emphatic[ally]" that Mother showed "poor judgment and [a] continued inability (since having her parental rights terminated to an older child in 2019 and since [the Children] were born) to put [the Children's] needs and welfare before her own."

¶34 The court also highlighted that during the time when Mother lived with Step-Grandmother, the Children were cared for by many different caregivers other than Mother. The court found that Grandparents were the main caregivers for GH, and the court emphasized that RH's daily and weekly care was provided by five different caregivers located in four different cities. Mother argues that a "child is not without proper parental care solely because that care is not always at the hands of a parent" and that it is "not uncommon for parents, especially single working mothers, to place children in daycare or arrange for care with family." In support of her argument, Mother cites *In re A.B.*, 2021 UT App 91, 498 P.3d 894, *aff'd*, 2022 UT 39, 523 P.3d 168, where we held that a child is not neglected if the child receives proper parental care, "even if not always at [a mother's] hand." *Id.* ¶ 20.

¶35 We agree with Mother that it can be completely appropriate for parents to arrange for others to help them in caring for their children, and we empathize with single parents whose childcare arrangements may not always seem ideal to others of greater means and opportunity. But Mother's behavior in this case is distinguishable from that in *In re A.B.* Here, the

juvenile court found, and Mother does not dispute, that Mother did "very little to make arrangements" for the Children, would drop off the Children at Sister's "at times unannounced," would not come home when she was expected to, and would not take care of the Children when at home. In contrast, *In re A.B.* concerned a child who spent summers with "*welcoming* relatives[,] . . . and *on agreement*, summer turned into a whole year." *Id.* ¶ 1 (emphases added). Moreover, that mother arranged the child's care with the relatives, *id.* ¶¶ 2–3, and she never refused to take care of her child when she oversaw the child's care, *id.* ¶ 19. Therefore, Mother's reliance on *In re A.B.* misses the mark.

¶36    Based on the foregoing, we conclude that the juvenile court's findings of fact meet the legal standard of neglect. *See* Utah Code § 80-1-102(58)(a)(ii). Therefore, we affirm its grant of permanent custody and guardianship to Grandparents. *See id.* § 80-3-405(2)(d)(i).[7]

## II. Parent-Time

¶37    Mother next argues that the juvenile court erred by failing "to even consider providing Mother parent-time in the final analysis order." While we don't quite agree with Mother's characterization of the order as a complete failure to consider Mother's residual rights, we agree that remand on this issue is necessary.

---

7. After a dispositional hearing, the juvenile court may award permanent custody and guardianship to a relative if it finds by clear and convincing evidence either abuse or neglect by the natural parent. *See* Utah Code §§ 80-3-402(1), -405. Mother made additional arguments that the court erred in determining that GH was abused by Father and that Mother had standing to appeal any determinations regarding Father that contributed to a finding that Mother neglected the Children. Because we affirm the juvenile court's determination that Mother neglected the Children, we do not need to address these arguments.

¶38 When the juvenile court vests custody of a child in someone other than the child's natural parent, the court "shall give primary consideration to the welfare of the minor." Utah Code § 80-3-405(2)(a)(ii)(A). Here the court did so by awarding custody to Grandparents, whom the court found to "have demonstrated their reliability and consistent efforts to provide for all of [the Children's] day-to-day physical, mental, emotional, developmental, medical, financial, and educational needs."

¶39 But the court's responsibilities when awarding custody do not end there. The court also "shall give due consideration to the rights of the parent or parents concerning the minor." *Id.* § 80-3-405(2)(a)(ii)(B). This includes consideration of awarding reasonable parent-time. Specifically, the statute provides that "[a] parent of a minor for whom a guardian is appointed retains residual parental rights and duties." *Id.* § 75-5-209(5). These residual parental rights include "the right to reasonable parent-time unless restricted by the court." *Id.* § 80-1-102(70)(a)(iv). Thus, our legislature intended for juvenile courts to give careful thought to an award of parent-time when granting custody and guardianship to someone else. And we note that parent-time is significant because it offers "the parent the possibility of maintaining a meaningful relationship with the child despite lack of physical custody." *Moreno v. Board of Educ.,* 926 P.2d 886, 890 (Utah 1996).

¶40 Yet here, the juvenile court simply stated that Mother's and Father's parent-time with the Children "shall be at the discretion and under the control or management" of Grandparents, without making any findings regarding the amount of parent-time that would be reasonable. Instead, the court delegated that determination entirely to Grandparents. And this could lead to Grandparents denying Mother any parent-time[8] without the court

---

8. Mother alleges that when she has asked Grandparents for parent-time, they have refused and told her, "You have no rights."

(continued…)

making any findings of fact to justify such a denial.[9] Here, we find the court's findings and conclusions regarding parent-time to be inadequate.

¶41    A juvenile court's factual findings "must be sufficiently detailed and include enough subsidiary facts to clearly show the evidence upon which they are grounded." *In re S.T.*, 928 P.2d 393, 398 (Utah Ct. App. 1996); *see also In re M.G.*, 2003 UT App 313U, para. 5 (holding that "a review of the court's oral findings reveals the subsidiary facts and basis for the juvenile court's written findings and demonstrates that the written and oral findings, taken together, are sufficiently detailed to permit appellate review"). "Put another way, findings are adequate when they contain sufficient detail to permit appellate review to ensure that the [juvenile] court's discretionary determination was rationally based. Indeed, the [juvenile] court's obligation to render adequate findings facilitates meaningful appellate review and ensures the parties are informed of the [juvenile] court's reasoning." *Lay v. Lay*, 2018 UT App 137, ¶ 19, 427 P.3d 1221 (cleaned up). "Unless the record clearly and [incontrovertibly] supports the [juvenile] court's decision, the absence of adequate findings of fact ordinarily requires remand for more detailed findings by the [juvenile] court." *Woodward v. Fazzio*, 823 P.2d 474, 478 (Utah Ct. App. 1991) (cleaned up).

¶42    We are unable to determine the court's basis for leaving all parent-time decisions in the hands of Grandparents, a situation that potentially denies Mother any parent-time with the Children.

---

Mother's allegations are not part of our appellate record, however.

9. It is possible for a juvenile court, in an appropriate case, to determine that a parent retaining residual rights is not entitled to any parent-time. But any such determination should be rare and should be supported with findings that demonstrate why it is not reasonable, for example, for the parent to have at least short periods of unsupervised or supervised parent-time.

Accordingly, we vacate the juvenile court's decision regarding parent-time and remand this matter for specific findings demonstrating what conditions of parent-time are reasonable. If the court determines that it is reasonable to award no parent-time to Mother, then the court must make specific findings to justify such a determination.

### III. Venue

¶43     Mother brought a motion to dismiss or change venue on the morning of trial, asserting that the case had been brought in the wrong venue.[10] The juvenile court took the motion under advisement and delayed ruling on the motion until it could take evidence and determine facts relative to venue. In its dispositional order, the juvenile court determined that venue was correct in the Seventh District. Now on appeal, Mother challenges that conclusion only as to RH. Mother maintains that on the day the petition for guardianship was filed, RH was living with Mother in Salt Lake County. Even assuming, for purposes of the discussion, that venue was incorrectly determined to be in the Seventh District as to RH, we affirm the decision of the juvenile court because Mother has failed to show any harm.

¶44     The guardian ad litem's briefing maintained that Mother needs to show harm to obtain reversal based on an erroneous denial of the motion to change venue as it pertains to RH. Mother does not quibble with this legal assertion but claims that she implicitly identified and showed harm in her principal brief. As both parties have proceeded under the assumption that an appellant must show harm, we will do likewise without deciding

---

10. Utah law provides that "a proceeding for a minor's case in the juvenile court shall be commenced in the court of the district in which . . . the minor is living or found." Utah Code § 78A-6-350(1)(b).

that discrete issue.[11] The sole harm Mother points to is that the case regarding RH would have been dismissed and that dismissal would have benefitted Mother. Mother is wrong on the first point and utterly fails to meet her burden of persuasion on the second.

¶45 First, as to automatic dismissal, this result was rejected several years ago by this court when *In re adoption of B.N.A.*, 2018 UT App 224, 438 P.3d 10, explored the consequences of hearing a case in the wrong venue. Initially, we explained that under current precedent, subject-matter jurisdiction is not implicated when a case is filed in the wrong district. *Id.* ¶¶ 12–24. Then we concluded that the "consequence for filing in the wrong district is not automatic dismissal." *Id.* ¶ 25. Instead, "any party, upon proper motion, may request that the case be transferred to the correct district." *Id.* So, if the Mother's motion had been granted, the case would have been transferred, not dismissed. Accordingly, the argument that harm resulted because the case would have been dismissed fails.

¶46 Second, Mother fails to identify any other harm. She merely concludes that "[d]ismissal would have benefitted Mother." But as just explained, dismissal would not have occurred. And Mother presents no argument that she would have obtained a different result had the case been transferred. Importantly, where Mother does not challenge that the case involving GH would have remained in the Seventh District, we easily foresee that upon transfer, any other juvenile court would have likely transferred the RH case back to the Seventh District under its discretionary powers, and more particularly under rule

---

11. Some courts that have decided this issue have held that harm must be shown. *See Lamb v. Javed*, 692 S.E.2d 861, 864 (Ga. Ct. App. 2010); *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). But we do not decide this issue and leave it for another day.

42 of the Utah Rules of Civil Procedure.[12] Further, Mother fails to show how the result rendered in a different venue would have been better for her. Thus, Mother fails to meet her burden of persuasion that she was harmed by the denial of her motion to change venue.

¶47 Accordingly, we see no basis to reverse the judgment of the juvenile court on the issue of venue.

CONCLUSION

¶48 We affirm the juvenile court's determination that Mother neglected the Children and that venue was proper in the Seventh District with regard to RH. We also conclude that the juvenile court made inadequate findings regarding its parent-time award. Therefore, we vacate the court's award of sole discretion over Mother's parent-time to Grandparents and remand the matter for further proceedings consistent with this opinion to consider Mother's residual parental rights when determining a reasonable award of parent-time.

---

12. Mother asserts that venue rights are so substantial that a denial of a motion to change venue can be grounds for an interlocutory appeal, citing *Davis County v. Purdue Pharma, LP*, 2020 UT 17, 463 P.3d 619. While this is true, Mother sought no interlocutory appeal here. And other courts have held that failure to immediately appeal a denial of a motion to change venue constitutes a waiver of the venue claim. *See, e.g., Patterson v. Alexander & Hamilton, Inc.,* 844 So. 2d 412, 415 (La. Ct. App. 2003).