**2024 UT App 52**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.S. AND J.S.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

V.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20230338-CA
Filed April 11, 2024

Third District Juvenile Court, Summit Department
The Honorable Elizabeth M. Knight
No. 1214949

Julie J. Nelson and Alexandra Mareschal,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     On the basis of a set of stipulated facts, the juvenile court adjudicated A.S. and J.S. as being neglected as to V.S. (Mother). Mother now challenges that adjudication on appeal, arguing that the stipulated facts did not support the neglect adjudication. For the reasons set forth below, we affirm.

BACKGROUND

*Initial Proceedings*

¶2    This is a child welfare case concerning two children: A.S., who was 16 years old at the time of this appeal, and J.S., who was 9 years old. A.S. and J.S. (collectively, the Children) are the biological children of Mother and J.S. (Father).[1] Mother and Father divorced in March 2018, and they've had an "ongoing" and "contentious" custody dispute in district court ever since.

¶3    In August 2022, the Department of Child and Family Services (DCFS) filed a petition for protective supervision services, alleging that the Children were "abused, neglected, or dependent children" pursuant to Utah Code section 80-1-102. The petition alleged a range of conduct to support this—most of it by Mother, though with one allegation relating to Father. This appeal is brought by Mother, so we'll focus on the allegations, proceedings, and rulings relating to her.[2]

¶4    On March 10, 2023, DCFS filed an amended petition relating to Mother, and the amended petition realleged some (but not all) of the allegations from the original petition. Based on the amended set of allegations, DCFS again alleged that the Children were abused, neglected, or dependent. That same day, the

---

1. Mother and Father also have another child who was not a minor during the proceedings in question.

2. For background purposes only, we note that the juvenile court held a "merged pretrial, adjudication, and partial disposition hearing" relating to the one allegation made against Father. At the close of that hearing, the court concluded that the Children were "dependent children . . . in that they were without proper care through no fault of [Father]." Father was ordered to comply with protective supervision services through DCFS as a result. Father has not appealed that ruling.

juvenile court held a "merged pretrial and adjudication hearing" relating to Mother, and Mother was represented by counsel at that hearing. Mother acknowledged under oath that she understood that she had a right to a trial, that DCFS bore the burden of proving the allegations against her by clear and convincing evidence, and that she had the right to present evidence in her defense. Mother then waived her right to a trial, affirmatively admitted to a specified list of the allegations from the amended petition, and, pursuant to rule 34(e) of the Utah Rules of Juvenile Procedure, "neither admitted nor denied" certain other specified allegations from the amended petition.

¶5     On the basis of Mother's affirmative admissions and the allegations deemed to be true by virtue of her rule 34(e) response, the juvenile court later issued a ruling that found a list of facts to be "true by clear and convincing evidence." We now recount those facts here, with any quotations being drawn directly from the court's precise verbiage.[3]

*The Stipulated Facts*

¶6     Since filing for divorce, Mother has sought four protective orders against Father: one in 2016, one in 2020, and two in 2022.

---

3. The parties in this case have all referred to these facts as "stipulated facts." As indicated, however, Mother affirmatively admitted to certain facts, but for others, she invoked rule 34(e) of the Utah Rules of Juvenile Procedure and neither admitted nor denied them. Under that rule, when a party "declin[es] to admit or deny the allegations," the "[a]llegations not specifically denied . . . shall be deemed true." *Id.* Thus, in a technical sense, the facts the court relied on pursuant to rule 34(e) might not actually be "stipulated" (because Mother didn't affirmatively agree to all of them), but by force of law, they might as well be. For ease of reference, we'll follow the lead of the parties and refer to the court's findings collectively as "stipulated facts."

Also, Child Protective Services (CPS) has received twelve reports accusing Father of neglect, physical abuse, sexual abuse, domestic violence-related child abuse, and other miscellaneous complaints which were not child welfare related. "All but one of these reports were either unaccepted because they did not meet CPS minimum requirements for investigation or unsupported because there was inadequate evidence to support the allegation after the matter was investigated." Only two of the twelve reports affirmatively identified Mother as the person who made the report, and though a touch unclear, a third suggested that she was likely the reporter.

¶7 Sometime in 2020, certain pictures were taken of J.S. at Wasatch Pediatrics. These pictures showed "mild inflammation" of J.S.'s "inner labia," "mild peri-anal erythema," and a "superficial linear abrasion in the crease of [her] right thigh and perineum." In August 2020 and again in April 2022, Mother shared medical records with DCFS that included those photographs, and she did so in both instances "as part of an abuse investigation." In April 2022, Mother "forwarded all communications with DCFS to the Ombudsmen's office at [its] request," again including these photographs.

¶8 In June 2022, Mother also "began documenting pictures of [J.S.'s] stool under the medical advice of" a gastroenterology specialist (Specialist) who was treating J.S. "for a chronic gastrointestinal issue."

¶9 On June 28, 2022, Mother took photographs of "bruises on [J.S.'s] knee, leg, and abdomen." One of these photographs was "taken in the bathtub when [J.S.] was naked," but J.S.'s "genitalia were not visible in the picture," and the other photographs taken on this occasion "were taken when [J.S.] was clothed."

¶10 Based on Mother's concerns about these bruises and about "additional vaginal redness," Mother took J.S. to the Redstone Clinic on June 30, 2022. A medical professional at the clinic "took pictures of the bruises and vaginal and anal redness" and then

instructed Mother to take J.S. to the Emergency Department at Primary Children's Hospital. In an effort to avoid a further genital exam, a doctor at the hospital accessed and viewed the photographs that had been taken at the Redstone Clinic. While at the hospital, Mother also spoke to the Safe and Healthy Families Clinic over the phone. Mother was advised to call the clinic back during normal clinic hours.

¶11 The next day, a doctor (Doctor) at the Safe and Healthy Families Clinic "indicated that the pattern of bruising [was] unusual and that in the absence of a history of accidental injury, inflicted injury, or physical abuse, the bruises would be a reasonable concern," but Doctor further opined "that sexual abuse of a child is most often recognized when a child makes a disclosure." Doctor also said that "constipation . . . is a common manifestation of childhood stress and only rarely associated with sexual abuse." As to the vaginal redness in question, Doctor said that it was "not an indicator of sexual contact," "particularly with swimming and warm weather." Doctor saw "no reason to have specific concern for sexual abuse in this case," and Doctor did not believe that J.S.'s symptoms met "the threshold for suspected abuse or neglect." Doctor therefore "did not make a report to either DCFS or law enforcement," and she saw "no need for follow up in the Safe and Healthy Families Clinic based on" the information that had been provided to her.

¶12 That same day, Mother spoke with an officer from the Summit County Sheriff's Office, again "reporting the bruises and vaginal and anal redness." When the officer offered to come to the home and take "pictures of the bruising," Mother declined. Instead, she sent him the pictures that she had taken of the bruising on J.S.'s knee, leg, and abdomen.

¶13 Sometime later that day, Mother called the Safe and Healthy Families Clinic. A nurse (Nurse) received a page regarding the call. Before calling Mother back, Nurse contacted

DCFS and was informed "that there had been several calls over the last few years, but all of them were closed unsupported." DCFS also informed Nurse that Mother had texted photos to DCFS and a detective. After receiving this information, Nurse called Mother. During that conversation, Mother "requested that Safe and Healthy Families conduct a forensic examination and take photographs of [J.S.'s] genitals due to a request from law enforcement." The juvenile court's subsequent finding recounts the following about what happened next:

> According to [Nurse], the mother told her that she had taken photographs of [J.S.'s] genitals before and after she went to see her father on the advice of a pelvic floor physical therapist. [Nurse] asked the mother three times for the name of the physician that advised her to take photographs and the mother refused to provide it. [Nurse] states that the mother eventually reported that she was documenting what [J.S.'s] genitals looked like before and after parent-time with her father. The mother indicates that she felt pressured and interrogated and was unable to provide the name of [Specialist] to [Nurse]. Mother states that she had trouble communicating with [Nurse] and was unable to explain everything.

The court's findings also note that "[n]o one has received" the "before and after" photographs described in the conversation Mother had with Nurse.

¶14 Doctor later shared her professional opinion that "she would have substantial concerns about repeated photography" of a child's genitals. In Doctor's view, children are "told repeatedly that these are private parts of our body," but because children would understand that photographs are "usually show[n] to all sorts of people," repeated photographing of genitals would

undermine this messaging. Doctor also expressed her view that subjecting a child to "multiple forensic exams" would improperly "normalize[] certain amounts of touching and manipulation of the genital region."

¶15    With respect to Mother, "[m]ultiple police reports and DCFS records indicate that [Mother] may be difficult to understand." It is "documented" that Mother has "POTS (post orthostatic tachycardia syndrome) which causes forgetfulness and trouble focusing (brain fog) making it difficult for [Mother] to think and speak clearly under stress."[4]

*The Neglect Adjudication*

¶16    Based on the stipulated facts, the juvenile court found that the Children "are neglected as to [Mother], as it is lack of proper parental care to subject a child to having her genitals photographed before and after visits with [Father], as well as sending other photographs to various agencies." The juvenile court then ordered that "[c]ustody and guardianship shall continue with the parents with protective supervision services with DCFS," and Mother was also ordered to "comply with the requirements of the DCFS service plan." Mother now appeals that ruling.

ISSUES AND STANDARDS OF REVIEW

¶17    The juvenile court ruled that Mother neglected the Children by (i) taking "before and after" photographs of J.S.'s genitals, as well as (ii) "sending other photographs" to various

---

4. Though the findings at issue don't specifically draw the link, DCFS's original petition in this case alleged that Mother has a "traumatic brain injury because a car hit her in December 2020," and the juvenile court also included this finding in an order that it entered with respect to Father elsewhere in this litigation.

agencies. As explained below, we need consider only the court's conclusions relating to the "before and after" photographs. With respect to those, Mother raises two challenges: first, Mother challenges the finding that she actually took the photographs; and second, Mother argues that even if she did, this did not constitute neglect. Although Mother's first challenge is to a factual finding, that finding was based on stipulated facts. When "the facts are stipulated, we review the conclusions drawn by the juvenile court for correctness." *In re K.T.*, 2023 UT App 5, ¶ 7, 524 P.3d 1003 (quotation simplified), *cert. denied*, 528 P.3d 327 (Utah 2023). We also review the court's interpretation of the neglect statute for correctness. *See In re M.S.*, 2023 UT App 74, ¶ 23, 533 P.3d 859 (holding that the determination of "whether the statutory criteria for neglect have been met" is "primarily a law-like endeavor" that is accordingly reviewed for correctness) (quotation simplified).

## ANALYSIS

¶18    The juvenile court concluded the Children are neglected as to Mother because "it is a lack of proper parental care to subject a child to having her genitals photographed before and after visits with [Father], as well as sending other photographs to various agencies." Because we determine that the "before and after" photographs alone are enough to support the neglect adjudication, we need not consider whether Mother also neglected the Children by sending the photographs to "various agencies."[5]

---

5. The court found that Mother took photographs of J.S.'s genitals, but there's no finding that she took similar photographs of A.S.'s genitals. Even so, the court found that both the Children are neglected. On appeal, Mother has not argued that this potential distinction provides a basis for reversing the adjudication as to A.S., and we therefore do not consider whether this is so.

¶19 Mother makes two arguments relating to the "before and after" photographs: first, she argues that there was not clear and convincing evidence that she actually took them; and second, she argues that even if she did take the photographs, this did not constitute neglect.

### I. There Was Sufficient Evidence to Support the Court's Conclusion that Mother Took These Photographs.

¶20 Mother first argues that there was not "clear and convincing evidence that Mother took photos of [J.S.'s] genitals before and after visits with Father." We disagree.[6]

¶21 At an adjudication trial, the juvenile court must determine whether "the allegations contained in the abuse, neglect, or dependency petition are true" by "clear and

---

6. The juvenile court did not explicitly find that Mother personally took these photographs. Rather, in this portion of the ruling, the court stated that it is a "lack of proper parental care to subject a child to having her genitals photographed before and after visits with [Father]." "Unstated findings can be implied," however, "if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882 (quotation simplified). Here, we conclude that the juvenile court did make an unstated finding that Mother took these photographs. As discussed in more detail below, Nurse claimed that Mother admitted to taking them. And of note, no one has claimed that anyone else took these particular photographs. Thus, when the court ruled that Mother had "subject[ed] a child to having her genitals photographed before and after visits with [Father]," the clear (and, indeed, only) implication that can be reasonably drawn from this record and the court's ruling is that the court implicitly found that Mother took these photographs.

convincing evidence." Utah Code § 80-3-402(1). "Clear and convincing evidence is an intermediate standard of proof that implies something more than the usual requirement" of a preponderance of the evidence and "something less than proof beyond a reasonable doubt." *In re K.K.*, 2023 UT App 13, ¶ 22, 525 P.3d 519 (quotation simplified), *cert. denied*, 531 P.3d 731 (Utah 2023). As noted, because the juvenile court made this finding on the basis of stipulated facts, we afford no deference to its conclusion that DCFS had satisfied the clear and convincing evidence standard. But even so, we conclude that this standard was satisfied.

¶22　The clearest indication that Mother took these photographs is the stipulated finding that Mother told Nurse that she took these photographs. The law has of course long recognized that admissions from a party can carry substantial evidentiary weight. As a result, once Mother told Nurse that she took these photographs, the court had a solid evidentiary basis for concluding that she had indeed taken them.

¶23　In a footnote of her brief, Mother nevertheless argues that the court should not have credited this admission. As an initial matter, Mother points out that "[n]o one has received" these particular photographs. And this seems to be true. But again, Mother told Nurse that she had taken them. From this, even without the actual photographs, the juvenile court could take Mother at her word and find that she had taken them.

¶24　More significantly, Mother suggests that her seeming admission was actually the product of a misunderstanding. As noted, the stipulated facts include that "Mother state[d] that she had trouble communicating with [Nurse] and was unable to explain everything." They also include that "[m]ultiple police reports and DCFS records indicate that [Mother] may be difficult to understand," and that it is "documented" that Mother has "POTS (post orthostatic tachycardia syndrome)," a condition that

"causes forgetfulness and trouble focusing (brain fog) making it difficult for [Mother] to think and speak clearly under stress." But even accounting for these facts, the juvenile court could still take Mother's admissions to Nurse at face value. This is so for several reasons.

¶25 The first is the specificity of Nurse's account. Nurse didn't say that Mother had made a passing or unclear comment to this effect. Rather, Nurse recalled Mother telling her that "she had taken photographs of [J.S.'s] genitals before and after she went to see [Father] on the advice of a pelvic floor physical therapist." On its own, the specificity of Nurse's account belies the suggestion that Nurse had simply misunderstood Mother.

¶26 Second, Mother seems to have reiterated her initial admission as the conversation with Nurse continued. According to Nurse, after Mother made her initial comment about taking these photographs, Nurse "asked [Mother] three times for the name of the physician" who had recommended taking them, but Mother "refused to provide it." If Mother had not meant to say that she was taking "before and after" photographs of J.S.'s genitals (or, instead, if she hadn't said it at all and Nurse had misheard her), Nurse's repeated questioning about which doctor had asked for the photographs would have given Mother the opportunity to clarify that she had misspoken (or that she had been misunderstood) and that she hadn't actually taken these photographs. But this wasn't Mother's response.

¶27 Instead, Nurse claimed that as the conversation continued, Mother "eventually reported that she was documenting what [J.S.'s] genitals looked like before and after parent-time with [Father]." Nurse's statement that Mother "eventually" told Nurse that she was "documenting" the condition of her daughter's genitals indicates that Mother reiterated that she had indeed taken them. And the fact that Mother then added the detail that she was "documenting" the "before and after" look of her daughter's

genitals functioned as her explanation for why she thought this was appropriate to do.

¶28     Finally, there's no place in either the court's ruling or even in the record as a whole where Mother has ever denied taking these photographs. Even when confronted with a specific allegation from DCFS about an instance in which a witness said that Mother admitted to taking them, Mother chose to respond with a non-admission/non-denial pursuant to rule 34(e).

¶29     Thus, the evidence before the juvenile court was that Mother had told Nurse that she had taken these photographs, that even with the benefits of further conversation and even subsequent litigation, Mother never retracted that admission, and that Mother had instead chosen to justify taking them. In light of all this, we see no basis for overturning the court's implicit finding that Mother personally took these photographs.

## II. The "Before and After" Photographs Were Enough to Establish Neglect.

¶30     "Neglect is statutorily defined," and it "can be proved in any one of several ways." *In re G.H.*, 2023 UT App 132, ¶ 28, 540 P.3d 631; *see also* Utah Code § 80-1-102(58)(a). The juvenile court here concluded that Mother's actions constituted neglect because "it is a lack of proper parental care to subject a child to having her genitals photographed before and after visits with [Father]." This was an apparent reference to Utah Code section 80-1-102(58)(a)(ii), which defines neglect as "action or inaction causing . . . lack of proper parental care of a child by reason of the fault or habits of the parent."

¶31     In her brief, Mother points out that the legislature has not further defined the phrase "lack of proper parental care." Drawing on various textual, structural, and even constitutional sources, Mother now asks us to take the opportunity to fill in the gap and provide further definition of what this phrase means.

While we need not create a definitive one-size-fits all definition, we do agree with Mother on a few broad points that inform our analysis below.

¶32    First, the word "proper" is commonly understood to refer to something that is "marked by suitability, rightness, or appropriateness."[7] Second and similarly, we think the phrase "proper parental care" would naturally incorporate notions of reasonableness. (After all, conduct that's appropriate would likely be reasonable, and the converse would also be true.) In this vein, we note that Black's Law Dictionary links the term "proper care" to notions of "reasonable care" that are commonly used in negligence cases, and Black's defines "reasonable care" as "the degree of care that a prudent and competent person engaged in the same line of business or endeavor would exercise under similar circumstances." *Care*, Black's Law Dictionary (11th ed. 2019). Third, because the statutory phrase at issue turns on notions of "proper parental care," the relevant inquiry is appropriately focused on what would be proper (with all that the word entails) "under similar circumstances"—meaning, in the particular parenting circumstance at issue. And finally, we agree with Mother that, in light of the fundamental and constitutional rights that are associated with parenting, the neglect standard should not be applied to conduct that falls within an ordinary range of permissible parenting.

¶33    With those principles in mind, we think the contours of this phrase can then capably be fleshed out in the same way that most other phrases from constitutions or statutes are fleshed out— through the ordinary process of common law development. And while there doesn't appear to be a Utah case that has comprehensively defined this phrase, the parameters of what

---

7 . *Proper*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/proper [https://perma.cc/YGY2-MJXP].

constitutes neglect have been explored and applied in a number of cases. Among others, we note the following:

- In *In re G.H.*, we held that the neglect standard was satisfied where the mother "did not attend to the children's basic health and welfare needs, such as feeding and bathing them, changing their diapers regularly, and obtaining medical care for them when they were sick," where the mother "did not behave in a manner consistent with parenting a child," and where the mother "would refuse to care for them when asked by the family members with whom she was living." 2023 UT App 132, ¶¶ 29–31, 540 P.3d 631 (quotation simplified).

- In *In re K.K.*, we held that the neglect standard was satisfied based on the mother's "inaction in failing to protect the children from exposure to domestic violence and prioritizing her toxic relationship" with the father. 2023 UT App 14, ¶ 12, 525 P.3d 526 (quotation simplified).

- In *In re K.D.N.*, we upheld a neglect determination that was based on "the lack of food," the "profound lack of parenting skills," and the presence of "violence" and "chaos" within the home. 2013 UT App 298, ¶ 11, 318 P.3d 768 (quotation simplified).

- In *In re D.T.*, we held that the neglect standard was satisfied based on the mother's "admitted relapse" on illegal drugs, "her frequent absences, inconsistent housing, lack of stability, and other behaviors." 2013 UT App 169, ¶ 5, 309 P.3d 248 (quotation simplified).

- And in *In re N.M.*, we held that "sufficient evidence support[ed] the juvenile court's determination that the father "neglected [his child] by engaging in domestic violence." 2013 UT App 151, ¶ 3, 305 P.3d 194.

In these and other cases, we held that the neglect standard was satisfied, not because of a failure of best-practices parenting, but instead because the behavior in question fell outside acceptable norms of proper parenting. To again use the phrase that we recently used in *In re G.H.*, such cases involve a parent who simply "did not behave in a manner consistent with parenting a child." 2023 UT App 132, ¶ 30.

¶34 So viewed, we agree with the juvenile court's conclusion here that Mother's behavior likewise reflected a "lack of proper parental care." Utah Code § 80-1-102(58)(a)(ii). Again, while DCFS alleged that Mother had neglected the Children based on a number of things (including her excessive reporting of abuse, as well as her decision to submit the photographs taken by doctors to law enforcement and medical professionals), the conduct at issue in the court's ruling was Mother taking photographs of a minor's genitals "before and after parent-time" with Father, as well as Mother's explanation that she was doing so to "document[] what" J.S.'s "genitals looked like before and after parent-time with" him.

¶35 The juvenile court had before it a statement from Doctor that she had "substantial concerns" about the "repeated photography" of a child's genitals. Doctor opined that such behavior can be damaging to a child, in part, because it can undermine the messaging that children receive about the privacy relating to their genitals. Doctor's concerns seem well-founded.

¶36 Moreover, we also note that the photographs in question here were taken by a parent who was in the midst of an "ongoing" and "contentious" custody dispute. By taking photographs of her young child's genitals "before and after" that child's visits with her father, Mother wasn't just potentially desensitizing her daughter to photography of her genitals, but Mother was also communicating to her daughter that she should be concerned that Father was sexually abusing her or at least was likely to do so.

This, too, carries obvious potential for harm, both to the child and to her relationship with Father.

¶37    We recognize, of course, that contextual questions such as the ones presented here can and often do turn on even small factual differences. And to be very clear, we don't mean to suggest that a parent (even one who is involved in a contentious custody dispute) must sit idly by if the parent has a good-faith basis for suspecting that a child is being abused. As illustrated by our survey of the relevant cases above, children should always be protected, and on that front, their parents are indeed the first line of defense.

¶38    If a parent has suspicions that a child is being sexually abused, the parent should of course do something to protect the child, and as indicated, a failure to do anything may well constitute neglect in its own right. Among other things, a parent might respond by reaching out to medical, law enforcement, or other trained professionals, and such professionals may well be involved in documenting any observed abuse. But unlike some of the other photographs at issue in this case, the particular photographs in question here weren't taken by professionals or in response to their recommendation, nor were they taken by Mother to document visible genital trauma.[8] Rather, according to the explanation that Mother "eventually" gave to Nurse during their conversation, Mother was trying to "document[] what [J.S.'s] genitals looked like before and after parent-time with her father." It was on this basis that the juvenile court concluded that the neglect standard had been satisfied.

---

8. In contrast, the juvenile court noted that the photographs taken in 2020 showed "inflammation" of the labia and a small "abrasion" near the groin, while the 2022 photographs showed "vaginal and anal redness."

¶39    We have no need to determine whether it would ever be within the bounds of "proper parental care" for a parent to take photographs of a young child's genitals without first involving trained professionals. And we note here too that, in addition to the suspected abuse scenario, there may be situations where such photography is in response to something more benign (such as diaper rash on an infant), and such contextual differences would likely place such photographs on different analytical footing. For purposes of this appeal, however, we simply conclude that it falls outside the realm of "proper parental care" for a parent to take photographs of a child's genitals "before and after" visits with the other parent for "documentation" purposes. On this basis, we affirm the juvenile court's conclusion that Mother neglected the Children.[9]

---

9. Mother also makes some allusion to the stipulated facts relating to certain photographs that she was taking on the advice of Specialist. It's unclear from the briefing whether Mother means to assert this as something of an "advice of doctor" defense to this neglect allegation. *See* Utah Code § 80-1-102(58)(b)(ii) (stating that neglect "does not include . . . a health care decision made for a child by the child's parent or guardian, unless the state or other party to a proceeding shows, by clear and convincing evidence, that the health care decision is not reasonable and informed"). In any event, those stipulated findings reflect that Specialist worked at a gastroenterology clinic, that Specialist was treating J.S. for "a chronic gastrointestinal issue," and that Mother had been "documenting pictures of [J.S.'s] stool" in conjunction with that treatment. Mother has not specifically asserted that, in conjunction with this gastroenterology treatment, Specialist also told her to take photographs of her daughter's genitals, much less that Specialist instructed her to "document[] what [J.S.'s] genitals looked like before and after parent-time with [Father]." We accordingly see no basis from this record to overturn the neglect finding on this potential ground.

CONCLUSION

¶40    We agree with the juvenile court's conclusion that, without something more, it constitutes a "lack of proper parental care," Utah Code § 80-1-102(58)(a)(ii), for a parent to take photographs of a child's genitals "before and after" visits with the other parent for "documentation" purposes. We affirm the adjudication of the juvenile court on that basis.

_____