2024 UT App 47

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF K.J., M.J., AND K.J.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

D.F. AND K.J.,
Appellants,
*v.*
STATE OF UTAH,
Appellee.

Opinion
Nos. 20230102-CA and
20230103-CA
Filed April 4, 2024

First District Juvenile Court, Logan Department
The Honorable Bryan P. Galloway
No. 1218130

Alexandra Mareschal, Kirstin Norman, and Jason B.
Richards, Attorneys for Appellant D.F.

Emily Adams, Attorney for Appellant K.J.

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1      In separate appeals that we consider together in this
opinion, K.J. (Father) and D.F. (Mother) (collectively, Parents)
challenge the juvenile court's orders removing their three children
(Children) from their home and, later, adjudicating the Children
abused and neglected. Parents' main challenge concerns the

court's adjudication that they abused and neglected the Children. Parents also assert that, in one respect, they received ineffective assistance of counsel. For the reasons discussed, we find Parents' arguments on these two topics unpersuasive.

¶2 But Parents also assert that, during the shelter hearing held at the beginning of the case, the juvenile court did not undertake a proper and complete analysis of the factors the governing statute required the court to consider. In this respect, Parents' arguments have merit, and we remand the case so that the juvenile court can conduct the proper statutory analysis.

BACKGROUND

¶3 Parents are the legal and biological parents of three "medically complex" children: Kevin, Mia, and Kaleb.[1] The family moved to Utah in 2022, after having lived in Nevada and Arizona; at that time, Kevin was five years old, Mia was four, and Kaleb was not quite two. Parents believed that the Children suffered from a long list of various medical maladies; when the family arrived in Utah, all three Children—despite having largely different medical diagnoses—had surgically placed gastric feeding tubes (G-tubes), were developmentally delayed, and used wheelchairs for mobility.

¶4 In July 2022, Kevin was rushed to a local hospital by ambulance after Mother reported that he had suffered a seizure. Mia was hospitalized at the same time due to concerns about weight and dehydration. Kevin and Mia were transferred to Primary Children's Medical Center (PCMC) in Salt Lake City; Kevin was treated with IV fluids to address "severe hypernatremia" due to dehydration. Kevin and Mia ended up

---

1. For readability, we use pseudonyms (rather than initials) to refer to the Children.

staying at PCMC for nearly two weeks, and Kevin was even admitted to the pediatric intensive care unit. While Kevin and Mia were at PCMC, medical professionals there became concerned that they were being medically neglected. In particular, hospital personnel observed that Kevin and Mia were "severely underweight," despite the presence of G-tubes, and "were considered a failure to thrive."

¶5     After Kevin and Mia were discharged from PCMC, all three Children were referred to a pediatric nurse practitioner (Nurse Practitioner) for follow-up primary care. When the Children arrived at her medical clinic, Nurse Practitioner discovered that the Children—partly due to only recently having arrived in Utah—were not yet set up for medical insurance. But after examining the Children, Nurse Practitioner agreed to treat them anyway, despite their lack of insurance, because in her view "it was medically necessary to see them regardless of the insurance difficulties." As she saw it, "these kids needed medical care whether [she] got paid" or not, because they were facing "significant medical issues" that she considered potentially "life and death" matters. The Children arrived at her clinic in wheelchairs and were developmentally delayed and nonverbal. None were toilet trained. Over the course of her treatment—which lasted several weeks—Nurse Practitioner also observed that the Children had not been "gaining [weight] as they [had been] in the hospital," which made her wonder whether the Children might at some point need "to be rehospitalized."

¶6     A few weeks later, a pediatrician (Pediatrician) was assigned to the Children. When he first saw the Children, he observed that they were all "nonverbal," and while Kevin had some ability to walk on his own, Mia and Kaleb were "nonambulatory." During the course of his treatment of the Children, he worked with them to improve their motor skills and their ability to walk, and he monitored their weight, which he

indicated was the thing he was "following most closely." Soon after Pediatrician took over primary care of the Children, Kaleb came in for his "two-year well[ness] visit." During that visit, Mother indicated that Kaleb had spina bifida, which is "a neural defect at the base of the spine" that can often be fixed with surgery. Mother insisted that Kaleb had already had the surgery to correct the spina bifida, and she even pointed to Kaleb's back where she indicated there was a scar from the surgery. But Pediatrician saw no scar.

¶7 At some point after Kevin and Mia were released from PCMC, a physician at Nurse Practitioner's clinic contacted the Utah Division of Child and Family Services (DCFS) to notify them about potential issues with the Children. Thereafter, DCFS assigned caseworkers to investigate the matter, and those caseworkers made some ten visits to Parents' home, prior to removal, to check on the Children and to assess the situation. These visits occurred at different times of day, yet in every visit except for one, the Children were all confined in "Pack 'n Play" playpens. Parents stated that the Children needed to be in the playpens so that their G-tubes could function properly, but caseworkers observed that Parents had—but were not using—portable devices that would have maintained a "continuous feed" from the feeding tubes without restricting the Children's movement. On one visit, one of the caseworkers asked Mother to show her the Children's medications, and in response Mother brought out a large "two feet by three feet" sized tote bag "full of prescription bottles and different ointments." During this time, Kevin—who was five years old and eligible to begin kindergarten—was not enrolled in school and therefore was not receiving any of the services a school could potentially provide to a medically complex child.

¶8 In addition to receiving primary care from Nurse Practitioner and Pediatrician , the Children were also referred to

and treated by the Pediatric Complex Care Clinic at PCMC. They missed their first scheduled appointment with the clinic, which caused the lead physician there (Physician) a great deal of concern, because she knew that "it was critical that [PCMC] follow up with" the Children. Physician notified DCFS of the missed appointment, which was eventually rescheduled for about three weeks later.

¶9 At that rescheduled visit, Mother reported to Physician that the Children were all suffering from "dysphagia," which is the "inability to swallow food properly." Physician observed that Kevin and Mia had "continued to lose weight" since their discharge from the hospital. This was troubling, because the Children all had G-tubes, which exist primarily to make sure the Children are receiving enough nutrition; as one member of the PCMC team testified, "a child with a G-tube whose caregiver is fully responsible for that nutrition intake should not be experiencing failure to thrive in the absence of a disease or pathology that could cause failure to thrive."

¶10 PCMC doctors investigated whether there could be any medical reason for the Children's continued malnutrition and failure to gain weight, and eventually concluded that "none of the [C]hildren [had] a pathology consistent with a disease process that could cause failure to thrive." Indeed, the PCMC team eventually determined that the Children's "malnourishment and poor growth [were] directly related to insufficient caloric intake," despite their G-tubes, and that the Children's "failure to thrive was not due to their medical conditions but due to [Parents'] neglect . . . in feeding them appropriately."

¶11 In addition, after her examination of the Children, Physician was concerned "that the [medical] history being provided by" Parents was "not consistent with what" she was "seeing on physical exam." Given these concerns, the PCMC team

then set out to review the Children's various medical diagnoses, as reported by Parents, with the goal of verifying or eliminating each of them. As reported by Parents, the Children suffered from the following medical maladies, among others:

- Kevin had suffered a stroke either in utero or shortly after birth, and had Ehlers-Danlos syndrome, Erb's palsy, a seizure disorder, hearing loss, premature birth, sleep apnea, and an "allerg[y] to the sun."

- Mia had DiGeorge syndrome, blindness, hearing loss, premature birth, cerebral palsy, and prediabetes.

- Kaleb had spina bifida, gastroparesis, premature birth, clubfoot affecting both feet, urinary retention issues that required catheterization, and hydrocephalus.

In an effort to confirm these diagnoses, the PCMC team requested, obtained, and reviewed over 7,000 pages of medical records regarding the Children, including records from Nevada and Arizona. After completing their review, and after examining the Children both before and after removal, the PCMC team was able to confirm some of the diagnoses. For instance, Kaleb does suffer from clubfoot in both feet, and Mia does have a genetic disorder similar to DiGeorge syndrome. But with regard to most of the diagnoses, the PCMC team concluded that Parents' assertions were simply unsupported by any medical evidence. In particular, they eventually determined that Kevin does not suffer from Ehlers-Danlos syndrome or any seizure disorder, and that he did not have a stroke either in utero or shortly after birth; that Mia was not legally blind; and that Kaleb did not have spina bifida or hydrocephalus and did not need catheterization.

¶12    Based on these conclusions, and on their examination of the Children, the PCMC team determined that Kevin and Kaleb

"had been the victim[s] of" "medical child abuse,"[2] and that the team had "serious concerns" in that regard about Mia. They called for "hospital admission" for the Children to "de-escalate elements of [their] care that are unfounded" and to "restart crucial interventions that have been ignored," with a focus on "nutrition and aiding age-appropriate development." And they recommended "development of a long-term plan for trauma-informed counseling and adherence to broad therapies, including speech therapy, occupational therapy, and physical therapy."

¶13    The PCMC team then met with DCFS caseworkers to explain their findings. Based in part on the information its agents learned at that meeting, the State determined to seek removal of the Children from Parents' home, and the very next day the State sought and obtained a removal warrant.

¶14    After obtaining the warrant, DCFS caseworkers traveled to Parents' home to remove the Children. When they arrived, the caseworkers again found the Children in their playpens. Parents were cooperative, however, and Mother changed the Children's clothes in preparation for the drive to PCMC. One caseworker observed that the Children were "a little stinky" and "had an odor to them like they hadn't bathed in a few days." The drive to the

---

2. In its reports regarding the Children, the PCMC team stated that "medical child abuse" is "a form of child maltreatment characterized by the fabrication or exaggeration of medical history, symptoms, and even exam findings and/or the induction of symptoms by a caregiver." Medical child abuse "occurs when a child receives unnecessary and harmful or potentially harmful medical care at the instigation of the caregiver," and it "results in manipulation of the medical system leading to child maltreatment in the form of unnecessary medical examinations, diagnostic testing . . . , imaging, and invasive procedures." Medical child abuse, in the past, was called "Münchausen syndrome by proxy."

hospital was uneventful; Kaleb "babbled . . . baby talk," while Kevin and Mia were "lethargic" and had a "very flat affect."

¶15 When the Children arrived at PCMC, hospital staff immediately noticed that the Children exhibited "very poor hygiene" and observed that the Children were each double or triple diapered and that the diapers were "sopping through." After the wet diapers were removed, hospital staff discovered that the Children had "fairly extensive [skin] breakdown in the diaper area" that was severe enough to require the assistance of the hospital's "wound clinic." Hospital staff noted that these sorts of wounds do not occur "overnight" and were the result of "there being wetness on the skin without appropriate response for some period of time." The Children also had "irritability and breakdown" around their G-tube sites; as with the diaper-area wounds, these wounds also required the assistance of the hospital's wound clinic.

¶16 Medical personnel also observed that the Children were "malnourished and under expected weight for [their] ages." Kevin was determined to be "severely malnourished," while Mia and Kaleb were determined to be "moderately malnourished." And blood tests on Kaleb "revealed abnormalities very concerning for chronic malnutrition."

¶17 The doctors considered the Children's malnutrition to be concerning, and they set about to discover why the Children were unable to regularly eat solid food. All three Children were administered "swallow studies" to determine their "ability to eat and drink by mouth." Kevin had such a severe "oral aversion to food and drink" that hospital personnel were unable to complete the test, and he was referred to a "speech/language pathologist" to help him overcome the aversion. Mia was "found to have a significant oral aversion to liquids," and was also referred to a "speech/language pathologist." Kaleb, on the other hand, was

determined to have no oral aversion and was "eager to eat and engaged with all thicknesses of feeds." Doctors concluded that Kevin and Mia's oral aversion was "likely the result of not being provided with solid food" at home, and that Kaleb's test results indicated a "serious concern" that he "did not need a feeding tube" at all.

¶18 Following removal, the Children stayed in the hospital for six days "to medically stabilize them and properly diagnose their conditions" through further examination and testing. During this time, the PCMC team was (as noted above) able to confirm the conclusions it had reached based on the earlier records review.

¶19 Upon discharge from PCMC, the Children were placed into foster care. Kevin and Mia were placed in the same homes, a temporary one at first for a few weeks before being moved to a more permanent placement. Kaleb was placed with a different foster family. Once in foster care, the Children showed rapid and measurable improvement. After having Kevin and Mia for only about a month, their foster mother reported that, while Kevin could only "scooch around the house on his hiney" when he arrived, he eventually learned not only to walk but to run, and he could often be seen doing "laps" around the kitchen island. He also began to allow his teeth to be brushed (something he had refused to allow at first), had become "a lot more personable" and affectionate, and began attending kindergarten and "loves school." Mia had some ability to walk when she arrived but was "[v]ery unstable"; over time, however, she had learned to "run really fast." The foster mother obtained glasses for Mia, which helped her navigate the world better. In the beginning, Mia refused to bathe, and would start "screaming and rocking and shaking" when asked to do so, but over time had become accustomed to it and "now she loves bath time." And Kaleb's foster mother reported that Kaleb could not crawl, walk, or talk when he arrived, but within a few weeks he learned how to not

only crawl but walk with the help of furniture, and he was able to say several words.

¶20 The foster parents also reported that they had enrolled the Children in appropriate schooling. Kevin was enrolled in kindergarten, where he began to receive speech and occupational therapy through the school. Mia was enrolled in preschool, where she was given an individualized education plan that included speech therapy. And Kaleb was enrolled in a state-run program known as "Up to Three," where he was able to obtain physical and speech therapy.

¶21 With regard to nutrition and weight gain, all three Children demonstrated swift and marked improvement in foster care. It wasn't long before the Children no longer required 24-hour G-tube feeding; soon, the Children were receiving feedings through the tube only at night and just two or three times during the day. All of them were soon eating solid foods; Kevin's foster mother reported that he had "tried 20 new foods" and he liked "spaghetti and pasta and yogurt and ice cream." Following an appointment about a month after foster placement, Physician noted that Kevin "looks to be doing great" and stated that, from "a weight perspective, he is gaining weight appropriately." And she noted that Mia "looked to be in excellent physical health."

¶22 Soon after the Children were removed from Parents' care, Pediatrician set up a meeting to inform Parents of the Children's condition and accurate diagnoses. Parents refused to accept the PCMC team's conclusion that many of the previous diagnoses were inaccurate; indeed, Pediatrician described Parents' reaction as one of "scoffing and disbelie[f] and unacceptance." Pediatrician later stated that, because of Parents' "blatant disregard of facts from medical tests and expert opinions from specialists," he "would be very worried" about the Children if they were to be placed back in Parents' care.

¶23  In the meantime, legal proceedings began in the juvenile court. One week after removal, the court held a shelter hearing, at which it heard testimony from Mother, Father, and one member of the PCMC medical team. At the conclusion of the hearing, the court stated that it was "convinced by a preponderance [of the evidence] that the [C]hildren were being neglected" by Parents. The court noted that daily oversight of the Children had been Parents' responsibility, and that this "oversight was done in a way that was neglectful." It specifically mentioned that, upon arrival at the hospital after removal, the Children all had "soiled" diapers and "open sores" in the diaper area as well as around the G-tube sites. The court noted that the Children "needed a great deal more medical oversight" than they had been getting, and that "at the very least" the case presented "medical neglect" with a "strong indication" that there was also "medical abuse." The court stated that it had been "up to [Parents] to identify [the issues] and care for these [C]hildren," who "were not thriving."

¶24  After making its findings of neglect, the court finished its shelter analysis with the following remarks:

> The [c]ourt does find that given the current state of the [C]hildren, exigent circumstances existed with regards to the removal. The removal was proper. At this particular time until there is a plan in place, the continued removal is necessary. Okay? At some point in time if a plan is in place and the parents have shown the ability to take into consideration the current medical condition of the [C]hildren and have shown the ability to work with the professionals that are providing that care for the [C]hildren, I don't see why it cannot at least be considered that the ongoing continued removal would not be necessary. Okay?

> At this point, I just don't have enough with regards to that. The only thing I have is that there was testimony that if placed back in the care of [Parents], this is going to get worse and worse and worse. I don't think that has to be the case really.
>
> So I do find removal proper, . . . [a]nd I do find that exigent circumstances, emergency circumstances did exist with relation to the removal at the time the [C]hildren were removed which absolved [DCFS] of the need to provide reasonable efforts to keep the [C]hildren in the home.

¶25 Later, the court issued an order memorializing its oral ruling. It found that "[t]he lack of physical care that the [C]hildren received by [Parents] constitutes neglect," and that the Children were "clearly not thriving." The court found that "[r]emoval of the [C]hildren from the home was proper and in [their] best interest," and that it was "contrary to [their] well-being . . . to remain in the home." And it found that, "because an emergency situation . . . existed at the time of removal, . . . any lack of pre-placement preventative efforts was appropriate and justified."

¶26 About six weeks later, the juvenile court held an adjudication trial. Over three trial days, the court heard from thirteen witnesses, including the involved DCFS caseworkers, Nurse Practitioner, Pediatrician, the foster parents, and various members of the PCMC medical team. They all testified about the events described above. At one point during the trial, the Children visited the courtroom, an event the court noted for the record, stating that it "was able to" see the Children and "watch them interact with" Parents. At the conclusion of the trial, the court took the matter under advisement.

¶27 Some ten days later, the court issued a lengthy written ruling in which it summarized the evidence presented at trial and

then determined that the Children had been abused and neglected by both Parents. With regard to abuse, the court found that the Children had "suffered or been threatened with nonaccidental harm in that unnecessary medical interventions have been performed that have caused physical harm" to the Children. In support of this finding, the court pointed to six different "unnecessary medical interventions": (1) a CT scan performed on Kaleb in 2022 that was against medical advice; (2) Mother's "[i]ntermittent catheterization" of Kaleb; (3) various medical tests performed on Kevin that "expos[ed him] to radiation unnecessarily"; (4) various unnecessary blood draws on Mia; (5) "bronchoscopies and modified Barium swallow studies" performed on all three Children that "may not have been necessary"; and (6) Parents' actions in "maintaining the [C]hildren on G-tubes" and "constant[ly] plac[ing]" them in playpens, actions the court found had "harmed the [C]hildren to the point that they became unable to eat food orally or develop the ability to walk."

¶28 With regard to neglect, the court's conclusion rested on two separate grounds. First, the court pointed to the Children's condition upon arriving at the hospital, finding that they were "malnourished" without any "medical reason" and "[d]espite placement of feeding tubes and 24/7 feeding," and that they were "nonverbal and unable to walk" because of parental neglect and not because of "their medical complexity." Based on their condition at the time of removal, the court concluded that the Children were neglected because Parents had failed "to provide for their basic physical needs on a day-to-day basis."

¶29 Second, the court pointed to Parents' belief that the Children had various medical maladies, many of which did not appear to be borne out by medical evidence, noting by way of example that there is no evidence that Kaleb has spina bifida or hydrocephalus. In that same vein, the court found that the

Children "have not received appropriate interventions for their developmental needs," noting specifically that Mia had not received appropriate medical treatment for certain neurological conditions and that none of the Children had been "enrolled in any physical therapy, occupational therapy, feeding therapy, or speech therapy since the family arrived in Utah." Accordingly, the court concluded that the Children were neglected because Parents had "failed or refused to provide proper and necessary subsistence [and] medical care when required."

¶30    After finding both abuse and neglect, the court concluded that "continued removal" was "in the best interest" of the Children, and that DCFS had "made reasonable efforts to prevent the removal," but that those efforts had been "unsuccessful." The court ordered that the Children "be placed in [DCFS's] custody and guardianship for appropriate placement."

ISSUES AND STANDARDS OF REVIEW

¶31    Parents now appeal, and they raise three issues for our review. First, Parents challenge the juvenile court's determination, made after the adjudication trial, that they had abused and neglected the Children. In this context, "we apply differing standards of review to findings of fact, conclusions of law, and determinations of mixed questions of law and fact." *In re M.S.*, 2023 UT App 74, ¶ 23, 533 P.3d 859 (quotation simplified). The factual findings underlying an abuse or neglect adjudication are reviewed deferentially and are reversed only if clearly erroneous. *See In re K.K.*, 2023 UT App 13, ¶ 21, 525 P.3d 519. But the court's ultimate determination regarding abuse or neglect is reviewed for correctness, because making that determination, which involves applying a given set of facts to statutory criteria, "is primarily a law-like endeavor." *See In re M.S.*, 2023 UT App 74, ¶ 23 (quotation simplified).

¶32   Second, Parents assert that, in one respect, their attorneys rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the [party] was deprived of the effective assistance of counsel as a matter of law." *State v. Kitzmiller*, 2021 UT App 87, ¶ 14, 493 P.3d 1159 (quotation simplified).

¶33   Finally, Parents challenge the juvenile court's earlier order following the shelter hearing, asserting that the court failed to engage in the proper statutory analysis before issuing its order finding that removal was necessary. In particular, Parents assert that the court did not properly analyze whether DCFS had made reasonable efforts to prevent removal, and that the court did not properly analyze whether there were services available, going forward, that might have prevented removal. At root, Parents' assertion is that the juvenile court misapplied the shelter statute. "We review [a lower] court's application of a statute for correctness." *Estate of Higley v. Utah Dep't of Transp.*, 2010 UT App 227, ¶ 6, 238 P.3d 1089 (quotation simplified).

ANALYSIS

I. Adjudication Order

¶34   Parents' main challenge is to the merits of the juvenile court's adjudication order, in which the court determined that the Children were abused and neglected as to both Parents. For the reasons discussed, we affirm the juvenile court's determination that Parents neglected the Children. In light of that ruling, and given the posture of Parents' arguments on appeal, we need not consider the merits of the court's abuse adjudication.

## A. Neglect

¶35    We first consider Parents' challenge to the juvenile court's neglect adjudication. In this context, "[n]eglect" includes parental "action or inaction causing" any one of six different results. *See* Utah Code § 80-1-102(58)(a). Yet not all six results are necessary for a neglect determination; when "the juvenile court [finds] neglect under several subsections, to affirm we need conclude only that neglect was established under one of the bases." *In re G.H.*, 2023 UT App 132, ¶ 28, 540 P.3d 631.

¶36    In this case, the juvenile court determined that Parents had neglected the Children under two of the six statutory subsections. First, based on the condition of the Children at removal, the court determined that Parents' action or inaction caused a "lack of proper parental care of a child by reason of the fault or habits of the parent." *See* Utah Code § 80-1-102(58)(a)(ii). Second, and alternatively, the court determined, based on the Children's medical conditions, that Parents had failed or refused "to provide proper or necessary subsistence or medical care, or any other care necessary for the child's health, safety, morals, or well-being*." Id.* § 80-1-102(58)(a)(iii). For the reasons discussed, we conclude that the juvenile court's first ground is supported by the evidence in this case, and we therefore need not reach the second.

¶37    In our view, the Children's condition at removal alone was sufficient for the juvenile court to determine that the Children were neglected. The Children were all malnourished, one of them "severely" so. They were all underweight and failing to thrive. Moreover, they all had mobility problems; none of them could walk in an age-appropriate manner. And none were toilet-trained. In addition, they arrived at PCMC with open sores in their diaper areas and around their G-tube sites that were severe enough to require consultation with the hospital's wound clinic.

¶38 Even though the Children are medically complex, the juvenile court found that there was no medical reason for their malnourishment, failure to thrive, or open wounds. That finding was not clearly erroneous. It should go without saying that allowing open wounds to develop or remain untreated is not medically necessary; certainly, Parents make no assertion to the contrary. And with regard to malnourishment and failure to thrive, PCMC doctors investigated whether there could be any medical reason for the Children's continued malnutrition and failure to gain weight, and eventually concluded that no such medical cause existed here. Absent a medical cause, children with G-tubes should not be malnourished. Following examination and testing, the PCMC team eventually determined that the Children's "malnourishment and poor growth [were] directly related to insufficient caloric intake," despite G-tubes, and that their "failure to thrive was not due to their medical conditions but due to [Parents'] neglect . . . in feeding them appropriately."

¶39 Parents resist the court's neglect determination by pointing to the neglect statute's exception for "reasonable and informed" health care decisions. *See id.* § 80-1-102(58)(b)(ii) ("Neglect does not include . . . a health care decision made for a child by the child's parent or guardian, unless the state . . . shows . . . that the health care decision is not reasonable and informed."). They assert, in essence, that their care of the Children has consisted of a series of health care decisions that the State has not shown to be unreasonable or uninformed. And on that basis they argue that the court's neglect determination was incomplete and improper.

¶40 Parents' arguments might have more force if the reason the State was asserting neglect had to do with a specific medical decision Parents made for the Children—say, for instance, their decision to place G-tubes in all three Children. But in this case, the juvenile court's neglect determination was—at least in relevant part—not based on any specific health care decision but, instead,

on the Children's condition at the time of removal. On that score, Parents—unlike the parents in *In re M.S.*, 2023 UT App 74, ¶¶ 41–48, 533 P.3d 859, who asserted that their baby's low weight was due to their decision to exclusively use breast milk rather than formula—make no effort to defend the Children's malnutrition and failure to thrive by pointing to any particular health care decision, whether reasonable and informed or not. Indeed, as noted, PCMC doctors concluded, after examination and testing, that there was no medical justification for the Children's malnutrition and failure to thrive. Under these circumstances, the statutory exception to "neglect" for "reasonable and informed" health care decisions simply has no application.

¶41 We therefore affirm the juvenile court's determination that, based on the Children's condition at removal, Parents—through their own "fault or habits"—had failed to provide "proper parental care" to the Children. *See* Utah Code § 80-1-102(58)(a)(ii). Because we affirm under subsection (a)(ii), we need not further discuss the court's alternative neglect determination, made under subsection (a)(iii). *See In re G.H.*, 2023 UT App 132, ¶ 28.

### B. Abuse

¶42 Moreover, because we affirm the juvenile court's neglect determination, we need not—in this case—consider the merits of the court's abuse determination. Juvenile court jurisdiction over a child can be based on, among other things, either abuse or neglect. *See In re G.B.*, 2022 UT App 98, ¶ 32, 516 P.3d 781 ("Importantly, jurisdiction could properly be based on either the abuse determination *or* the neglect determination."). Our decision affirming the juvenile court's neglect adjudication means that the court has continuing jurisdiction over the Children, regardless of the merits of Parents' challenge to the court's abuse adjudication.

¶43 In situations like this one, the propriety of the court's abuse adjudication ends up being an inconsequential point, unless the

affected parent can demonstrate that there will be "collateral consequences associated with an abuse determination that do not follow from a neglect determination." *Id.* ¶ 34. In this case, Parents make no effort to articulate any collateral consequences that might follow from an abuse adjudication that are not already present from a neglect adjudication. And when asked during oral argument if we would need to address abuse if we were to affirm on neglect, Parents agreed that, in that situation, we would not need to address abuse. We therefore have no occasion to consider the merits of Parents' challenge to the court's abuse adjudication.

## II. Ineffective Assistance of Counsel

¶44 Next, Parents assert that their attorneys provided ineffective assistance during the adjudication proceedings by failing to consult with or call an expert who could have testified about "medical child abuse" and about Parents' state of mind and intentions regarding their care of the Children. Under the circumstances of this case, we reject Parents' claim of ineffective assistance of counsel.

¶45 In child welfare cases, we employ the "*Strickland* test to determine a claim for ineffective assistance of counsel." *See In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)), *cert. denied*, 890 P.2d 1034 (Utah 1994). Under that test, Parents "must show that (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defense." *In re C.M.R.*, 2020 UT App 114, ¶ 19, 473 P.3d 184 (quotation simplified). "To demonstrate deficient performance," Parents "must persuade this court that, considering the record as a whole, [c]ounsel's performance was objectively unreasonable." *In re R.G.*, 2023 UT App 114, ¶ 16, 537 P.3d 627. And to show prejudice, Parents "must demonstrate a reasonable probability that the outcome of [their] case would have been different absent counsel's error." *In re C.M.R.*, 2020 UT App

114, ¶ 21 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." *Id.* (quotation simplified). In this case, Parents cannot meet either element of the *Strickland* test.

¶46    In support of their ineffective assistance claim, Parents have submitted a declaration from a forensic pathologist (Expert) who indicates that he has experience in cases of medical child abuse. Expert offers his view that, in most cases of medical child abuse, the "responsible parent . . . receives some form of secondary benefit, either financial or psychologic, from the inappropriate and unwanted medical care the child receives." But he states that, in other cases, the unnecessary medical care is the result of "miscommunication between medical providers and patients" and of "the unsophistication and/or limited cognitive resources" of the parents. Expert states that, in order to offer a useful opinion in this case, he would need to undertake "an adequate psychologic and cognitive assessment" of Parents. He has not yet undertaken any such assessment, although he notes that he has reviewed the reports of another examiner who assessed Parents, and he offers his view that these reports "appear to endorse mental functioning deficits" on Parents' part "that could lead to inaccurate conceptualizations of [the Children's] medical conditions and treatment needs," and that nothing he sees in those reports "implies [that Parents] are putting [the Children] at risk for selfish or self-aggrandizing motives."

¶47    Under the circumstances presented here, a reasonable attorney could have decided not to consult Expert. The opinions Expert offers speak only to medical child abuse, and not to whether Parents neglected the Children by not feeding them enough and not enabling them to grow and thrive despite their medical maladies. As noted above, we affirm the juvenile court's neglect determination without reaching the merits of any questions about the propriety of the Children's various medical

diagnoses. Because Expert has nothing useful to say about Parents' manifest neglect of the Children notwithstanding their diagnoses, a reasonable attorney could have determined that consultation with Expert was not necessary or helpful. Accordingly, we conclude that Parents have not demonstrated that their attorneys performed deficiently.

¶48　For much the same reason, Parents have also not shown prejudice. Even if their attorneys had consulted with and retained Expert, his testimony—given that it goes only to abuse and not to Parents' neglect of the Children as evidenced by the Children's condition at removal—would not have made a difference to the outcome of this case.

¶49　Thus, we conclude that Parents have not borne their burden of demonstrating that their attorneys rendered constitutionally ineffective assistance.

### III. The Shelter Order

¶50　Finally, we consider Parents' challenge to the juvenile court's earlier shelter order. Before considering the merits of that challenge, we address one preliminary issue: whether Parents have properly appealed the shelter order. After concluding that Parents have properly mounted an appeal from the shelter order, we proceed to address the merits of Parents' arguments.

### A. Appealability

¶51　We do not see very many appeals from shelter orders. We suspect that this is because shelter hearings occur at the very beginning of any child welfare case, and because orders coming out of those hearings are not considered final orders that are immediately appealable as of right. We therefore take this opportunity to discuss the appealability of shelter orders, and we

conclude that Parents have properly appealed from the shelter order here.

¶52   "As a general rule, an appellate court does not have jurisdiction to consider an appeal unless the appeal is taken from a final order or judgment that ends the controversy between the litigants." *In re J.E.*, 2023 UT App 3, ¶ 17, 524 P.3d 1009 (quotation simplified). And, at least conceptually, "the finality of an order in juvenile proceedings is determined the same way as the finality of an order in other courts." *Id.* ¶ 18 (quotation simplified). "But it is fair to say that, in appeals from juvenile court, finality is viewed somewhat more flexibly than in the district court context." *Id.* ¶ 19. In juvenile court cases, "the determining factor" as to finality "is whether [the order in question] effects a change in the permanent status of the child." *Id.* (quotation simplified). Using this "pragmatic analysis of the order itself," Utah appellate courts have concluded that, in juvenile court cases, "appeals may be heard from more than one final judgment." *Id.* (quotation simplified). In particular, adjudication orders and termination orders are considered final orders that are appealable as of right, while "shelter orders" are "not considered final." *Id.* ¶ 20; *see also In re S.A.K.*, 2003 UT App 87, ¶ 13, 67 P.3d 1037 ("An adjudication order is one such judgment that we have found to be final for purposes of appeal."); *In re M.V.*, 937 P.2d 1049, 1051 (Utah Ct. App. 1997) (per curiam) (holding that, because a shelter hearing only creates temporary orders, "a shelter hearing order . . . is not final and appealable as a matter of right").

¶53   Because shelter orders are not considered to be final orders, they are not immediately appealable as of right.[3] To properly

---

3. Parties can, of course, request permission to appeal any interlocutory order (including shelter orders) under rule 5 of the Utah Rules of Appellate Procedure. But parties are not required

(continued…)

appeal such orders as a matter of right, the party wishing to challenge the shelter order must wait until the court has entered a final appealable order. At that point, the party may take an appeal from the final order, which appeal "may include challenges to interlocutory orders" issued by the court prior to entry of the final order. *Jensen v. Jensen*, 2013 UT App 143, ¶ 2 n.1, 304 P.3d 878 (per curiam); *accord U.P.C., Inc. v. R.O.A. Gen., Inc.*, 1999 UT App 303, ¶ 13, 990 P.2d 945.

¶54     In this situation, the adjudication order was the first final and appealable order issued by the juvenile court following entry of the shelter order. Thus, Parents' opportunity to appeal the shelter order as of right presented itself upon entry of the court's adjudication order. And Parents seized that opportunity by filing their notices of appeal. In each notice, Parents specified that they were appealing from the court's adjudication order; they did not specify that they also wanted to appeal from the court's interim shelter order, but parties are not required to include such

---

to seek review under rule 5, and such review is in any event completely discretionary with the appellate court. *See* Utah R. App. P. 5(a), (g). In this case, Parents did not seek permission to appeal the shelter order under rule 5, but this fact does not affect their ability to later appeal the shelter order following the eventual entry of a final order. *See State v. Troyer*, 866 P.2d 528, 530 (Utah 1993) (stating that "the scope of appellate review from a final judgment" is not "in any way affected or limited by the possibility that any one or more of the trial court's rulings might have formed the basis of a petition for an interlocutory appeal"); *see also In re S.F.*, 2012 UT App 10, ¶ 28, 268 P.3d 831 (stating that the fact that a parent "could have elected to petition for interlocutory appeal" from an earlier nonfinal order "does not eliminate our authority to review" the earlier order "once the neglect and termination proceedings were completed and an appeal timely filed"), *cert. denied*, 280 P.3d 421 (Utah 2012).

specification in the notice of appeal. *See Wilson v. Sanders*, 2019 UT App 126, ¶ 28, 447 P.3d 1240 ("The language of rule 3(d) [of the Utah Rules of Appellate Procedure] does not require a party appealing from an entire final judgment to specify each interlocutory order of which the appellant seeks review." (quotation simplified)), *cert. denied*, 456 P.3d 388 (Utah 2019). Parents then indicated in their appellate petition, filed a few months later, that they were challenging not only the adjudication order but also the interlocutory shelter order.

¶55   Thus, Parents took all the right steps to appeal the juvenile court's shelter order. Such orders are not immediately appealable as of right, but a challenge to such orders may be included in any appeal from the next subsequently entered final order. Parents properly included their challenge to the shelter order in their appeal from the next final order entered by the juvenile court: the adjudication order.

### B. Parents' Challenge to the Shelter Order

¶56   Having concluded that Parents have properly mounted an appeal from the juvenile court's shelter order, we proceed to consider the merits of Parents' appellate challenge. In this case, Parents raise a very specific objection to the shelter order. They assert that the court did not properly address two of the required components of the statutorily mandated removal analysis: (1) "whether reasonable efforts were made to prevent or eliminate the need for removal," and (2) "whether there are available services that would prevent the need for continued removal." *See* Utah Code § 80-3-301(10)(a)(i). In considering the merits of Parents' challenge, we first conclude that the juvenile court did indeed err in its application of the shelter statute. In a separate section, we then discuss the appropriate remedy in this situation.

1

¶57 Utah law requires juvenile courts, before removing a child from a parent's home, to make several specific findings. At issue here are the requirements of subsection 10(a) of the shelter statute. That subsection states, in relevant part, as follows:

> (i) The juvenile court shall make a determination on the record as to whether reasonable efforts were made to prevent or eliminate the need for removal of the child from the child's home and whether there are available services that would prevent the need for continued removal.

> (ii) If the juvenile court finds that the child can be safely returned to the custody of the child's parent or guardian through the provision of the services described in Subsection 10(a)(i), the juvenile court shall place the child with the child's parent or guardian and order that the services be provided by [DCFS].

*Id.* § 80-3-301(10)(a).

¶58 Thus, this statutory provision requires juvenile courts to make, "on the record," two separate but related determinations. *See id.* § 80-3-301(10)(a)(i). The first one is a backward-looking inquiry that asks whether, prior to removal, DCFS has made "reasonable efforts" to "prevent or eliminate the need for removal." *Id.* However, if DCFS's "first contact with the family occurred during an emergency situation in which the child could not safely remain at home," the juvenile court need not engage in a traditional reasonable-efforts analysis but, instead, "shall make a finding that any lack of preplacement preventive efforts . . . was appropriate." *Id.* § 80-3-301(11).

¶59 The second—and related—determination requires analysis of "whether there are available services that would prevent the need for continued removal." *Id.* § 80-3-301(10)(a)(i). As we understand it, this inquiry is different from the reasonable-efforts analysis, in that it looks forward rather than backward. As relevant here, the question is not whether reasonable efforts have been made in the past, but whether services are available, going forward, that could "prevent the need for continued removal." *Id.*

¶60 With regard to the first part of this inquiry, the court in its oral ruling offered its view that "emergency circumstances did exist" at the time of removal "which absolved [DCFS] of the need to provide reasonable efforts." And in its later written order, it found that, "because an emergency situation and aggravated circumstances existed at the time of removal, and the [C]hildren could not safely remain in [Parents'] home, any lack of pre-placement preventative efforts was appropriate and justified."[4]

---

4. There are other statutory provisions that, in specific cases, may operate to excuse or render irrelevant any lack of pre-removal reasonable efforts. *See, e.g.,* Utah Code § 80-2a-201(6) (stating that, "in cases where sexual abuse, sexual exploitation, abandonment, severe abuse, or severe neglect are involved, the state has no duty to make reasonable efforts or to . . . maintain a child in the child's home"); *id.* § 80-2a-302(4) (same); *id.* § 80-3-301(12) (same). No party asserts that any of these other Utah statutes are applicable here. In a supplemental authority letter submitted to us after oral argument, however, the guardian ad litem (GAL) asserts—for the first time—that the juvenile court's allusion to "aggravated circumstances" was an implicit effort to resort to a provision of federal law, which provides that "reasonable efforts . . . shall not be required . . . if a court of competent jurisdiction has determined that the parent has subjected the child to aggravated

(continued…)

¶61 Parents assert that this analysis was erroneous because the "emergency" exception that absolves DCFS from making reasonable pre-removal efforts to prevent removal applies only in cases in which DCFS's "*first* contact with the family occurred during an emergency situation," *see id.* § 80-3-301(11) (emphasis added), a situation not applicable here. The State advances a broader interpretation of this statutory exception, but in our view Parents' interpretation is the correct one.

¶62 The State agrees with Parents that, in situations in which DCFS's *first* contact with the family is in an emergency situation, the statute *requires* the court to make a finding that any lack of reasonable efforts was appropriate. *See id.* But it asserts that this provision does not prevent a court from "mak[ing] a finding of exigency in any case where [DCFS] has already been working with the parents," and it posits that a juvenile court has the authority to dispense with the pre-removal reasonable-efforts inquiry anytime it believes the situation is emergent. We disagree.

¶63 The previous subsection requires that a pre-removal reasonable-efforts finding be made. *See id.* § 80-3-301(10)(a)(i).

circumstances." 42 U.S.C. § 671(a)(15)(D)(i). As an initial matter, we note that parties may not raise new legal theories in post-argument supplemental authority letters. *Cf. State v. Seat*, 2022 UT App 143, ¶ 39 n.4, 523 P.3d 724 (stating that parties are "not permitted to raise a new question for the first time at oral argument" before this court). But more substantively, the GAL's argument fails on its face; even if we assume, for purposes of the discussion, that the juvenile court's comment was actually a reference to a federal statutory exception to the reasonable-efforts requirements, resort to the federal statute is unhelpful here because, at the time of the shelter hearing, no "court of competent jurisdiction" had made any determination that Parents had done anything wrong.

There are no exceptions built into this subsection. To be sure, there is an exception built into the *next* statutory subsection, but that provision, on its face, applies only to situations in which DCFS's first encounter with the family occurred in an emergency situation. We decline the State's invitation to read a broader emergency exception into the statute. *See St. Jeor v. Kerr Corp.*, 2015 UT 49, ¶ 13, 353 P.3d 137 ("[W]e will not read additional limitations into [a rule] that the language cannot bear."); *Greene v. Utah Transit Auth.*, 2001 UT 109, ¶ 15, 37 P.3d 1156 ("[W]e will not disturb explicit legislative requirements and read into the statute an actual notice exception."). We conclude that subsections (10) and (11) of the shelter statute, when read together, contemplate an exception to the reasonable-efforts requirement that is applicable only when DCFS's first encounter with the family occurs during an emergency situation.[5]

¶64 That narrow exception is not applicable here. DCFS was first notified of potential problems with the Children in August 2022, some three months before removal. Between DCFS's first notification (in August) and removal (in November), DCFS assigned caseworkers to the family, and those caseworkers made at least ten visits to Parents' home. This is simply not a situation in which DCFS's "first contact with the family" occurred in an emergency situation, and therefore the "emergency" exception to the reasonable-efforts inquiry does not apply here. The juvenile court therefore erred in applying that exception in this case, and it should have proceeded, at the shelter hearing, to consider

---

5. We can certainly envision policy concerns that might support a broader exception to the reasonable-efforts requirement that could apply in any emergency situation, regardless of whether DCFS had already been working with the affected family. We note here, as we sometimes do, that our legislature is free to amend the statute if it believes we have misinterpreted legislative intent.

whether DCFS had made reasonable pre-removal efforts to avoid taking the Children out of Parents' home.

¶65　The juvenile court's error in this regard, however, appears to have been rendered moot by the court's later finding, made after the adjudication trial, that DCFS had "made reasonable efforts to prevent the removal of the [C]hildren, but those efforts were unsuccessful." While Parents complain that the court did not undertake this analysis after the shelter hearing, they do not make any effort to challenge the finding that the court eventually made just two months later after the adjudication trial. Under these circumstances, any error the court made by relying on the emergency exception at the shelter hearing, and by failing to make a "reasonable efforts" finding at that time, has been rendered inconsequential by the court's later unchallenged finding that DCFS had indeed made reasonable efforts to prevent removal.

¶66　We turn now to the second part of the inquiry, the part that requires the court to determine, on a going-forward basis, "whether there are available services that would prevent the need for continued removal." *See* Utah Code § 80-3-301(10)(a)(i). In this vein, the court stated, in its written order, as follows:

> If, at some point, there is a plan in place and [Parents] have shown the ability to take into consideration the current medical condition of the [C]hildren, and have shown the ability to work with the professionals providing that care for the [C]hildren, the [c]ourt would re-consider whether ongoing and continued removal would be necessary.

This comment indicates that the court was of course aware that services do exist—such as physical, speech, and occupational therapy for the Children and medical education and in-home health care assistance for Parents—that are designed to improve

situations like the one presented here. And it indicates that the court was making an effort to apply the second part of the statutory analysis.[6] But the court, in its analysis, did not take the next analytical step and assess whether specific services could be provided to the family, in that moment and going forward, that might obviate the need for removal. *See id.* Simply stating that, at some point in the future, the court might reconsider its removal order is not sufficient; indeed, in most child welfare cases, the initial permanency goal is reunification, and juvenile courts nearly always stand ready to reconsider removal orders in appropriate cases. The shelter statute requires a more exacting analysis prior to removal, and the court's failure here to ask and answer the correct statutory question was error.

¶67   And unlike the court's error regarding the backward-looking reasonable-efforts determination, this error was not later remedied by later findings made after the adjudication trial. The State points to no similar finding made after the trial, and we are aware of none.

¶68   We therefore conclude that the juvenile court made two errors in its attempt to comply with the shelter hearing statute. First, it misapplied the "emergency" exception to its obligation to make a backward-looking reasonable-efforts determination at the shelter hearing. Second, it failed to make a specific forward-looking determination about whether services could be provided

---

6. On this basis, we reject the State's assertion, also advanced by the GAL, that Parents failed to preserve any objection to the court's application of the shelter statute. Our supreme court has made clear that there is no preservation problem where the trial court "not only had an opportunity to rule on the issue . . . but in fact did rule on it." *See Fort Pierce Indus. Park Phases II, III & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (quotation simplified).

to the family that would serve to obviate the need for removal. The first error was rendered inconsequential by later findings. But the second one wasn't, and we must therefore consider what the proper remedy is, in this situation, to address the court's error.

2

¶69    Before doing so, we take the opportunity to emphasize the importance of completing the proper statutory analysis at the shelter hearing. While such hearings take place early in the case and are generally not comprehensive trials, they can assume a position of great importance in the arc of a child welfare case. To be sure, removal orders are temporary nonfinal orders that can be—and in many cases are, *see, e.g.*, *In re M.S.*, 2023 UT App 74, ¶¶ 2–21, 533 P.3d 859 (considering a situation where a child was placed back into the parent's home at a later hearing, after initial removal)—amended or modified, but removal orders nevertheless memorialize a seminal moment in a child welfare case. Such cases often proceed much differently after the shelter hearing depending on whether the child was (or was not) removed. It is therefore vital that courts undertake the analysis required by the shelter statute, and that, before removal, they engage with both the backward-looking reasonable-efforts analysis as well as the forward-looking services analysis.

¶70    The importance of getting shelter hearings right the first time is highlighted by the difficulty of putting the removal genie back in the proverbial bottle. As this case illustrates, by the time appellate review of a shelter order can take place, the family's situation will often look much different than it did at the shelter hearing. While post-adjudication events are not part of the record submitted to us on appeal, we are nevertheless aware that, while this appeal has been pending, significant events have taken place that might affect the way the juvenile court analyzes the question of whether services are available that could obviate the need for

continued removal. For instance, we are aware that criminal child abuse charges have been filed against Parents. In addition, we are aware that, since the adjudication hearing, Parents have received certain services, and the court has had the opportunity—at a permanency hearing held in January 2024—to assess the efficacy of those services. And there have doubtless been other developments that have occurred in the previous sixteen months of which we are appropriately unaware.

¶71    In this case, by way of remedy, Parents ask us to vacate the initial removal order and remand the case so that the juvenile court can conduct an entirely new shelter hearing. We do not view this as an unreasonable request; indeed, when an error is made at a hearing, a common remedy is to remand the case for the court to conduct a new hearing. But even though we do not view Parents' request as unreasonable, in this situation the request is not entirely practical. After all, the situation is much different now from what it was in November 2022, and in cases involving children, our usual remand instructions include an admonition to the court to conduct any new hearing, on remand, in present-tense fashion, as of the date of the renewed hearing, taking into account all that has happened in the child's situation since. *See In re Z.C.W.*, 2021 UT App 98, ¶ 12, 500 P.3d 94.

¶72    Under the circumstances, we agree with Parents that the juvenile court's error cannot go entirely unremedied, and that the case should therefore be remanded so that the juvenile court can complete the analysis required by the shelter statute and, in particular, consider "whether there are available services that would prevent the need for continued removal." *See* Utah Code § 80-3-301(10)(a)(i). But this inquiry should not be undertaken as of the date of the initial shelter hearing; instead, this inquiry should, on remand, be conducted in present-tense fashion, taking into account all relevant existing developments. *See In re Z.C.W.*,

2021 UT App 98, ¶ 12.[7] Moreover, we offer no specific instruction to the juvenile court as to whether, and to what extent, it must hold an evidentiary hearing on remand; we conclude only that the court must properly complete the required statutory analysis and that it "must—in some manner—consider and appropriately deal with proffered new evidence." *See id.* ¶ 15. And we do not, in this opinion, order that the removal order be vacated; the juvenile court may order that relief, if it deems such relief appropriate, only after completing its analysis on remand.

¶73　Finally, we wish to make clear that we harbor no opinion as to how the juvenile court's renewed analysis should come out; given the realities of chronology, the juvenile court (conducting a present-tense analysis) will have a lot more information than we do now, on this record, about how the Children are doing and how Parents have responded to the situation during the period between the shelter hearing and the permanency hearing. It may well be that the court reaches the same result, after conducting a more complete shelter analysis, that it reached at the permanency hearing in January 2024. On the other hand, it may be that the court, after conducting the proper shelter analysis, finds it appropriate to vacate or amend one or more of its previous orders. But either way, it is important that courts conducting shelter

---

7. In *In re Z.C.W.*, 2021 UT App 98, 500 P.3d 94, our instruction that the renewed hearing be conducted, on remand, in present-tense fashion was a function of the applicable statute using a present-tense locution. *See id.* ¶ 13 (interpreting a statute requiring juvenile courts to assess "whether termination *is* in the best interest of the child" (quotation simplified)). The statute at issue here also uses a present-tense locution. *See* Utah Code § 80-3-301(10)(a)(i) (requiring assessment of "whether there *are* available services that would prevent the need for continued removal" (emphasis added)). We therefore conclude that, in this situation, a present-tense perspective is required on remand.

hearings, before they take the rather drastic step of removing children from a parent's home, follow the requirements of the shelter statute. We remand the matter so that these requirements may be satisfied in this case, albeit belatedly.

CONCLUSION

¶74 We discern no error in the juvenile court's determination that, based on the condition of the Children upon removal, the Children were neglected by both Parents. And we reject Parents' assertion that their attorneys rendered ineffective assistance during the adjudication process.

¶75 However, we conclude that the juvenile court did not conduct the proper statutory analysis at the initial shelter hearing. We therefore remand this case to the juvenile court so that it can complete the required analysis and assess, in present-tense fashion, whether there are services available that can prevent the need for continued removal.

———————